[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-10574

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 12, 2011
JOHN LEY
CLERK

D.C. Docket No. 3:08-cr-00136-LC-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DAVID W. WEBB,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(September 12, 2011)

Before HULL, BLACK and STAPLETON,[*] Circuit Judges.

PER CURIAM:

---

[*]Honorable Walter K. Stapleton, United States Court of Appeals for the Third Circuit,
sitting by designation.

Defendant-Appellant David W. Webb ("Webb") was convicted of 130 counts arising, <u>inter alia</u>, from his wire fraud, health care fraud, and unlawful dispensing of controlled substances. Webb also was convicted of three counts charging that a patient's death resulted from the use of controlled substances dispensed by Webb or from his health care fraud violation. Webb is serving concurrent life sentences on the three death-results convictions, and numerous five, ten, and twenty-year concurrent sentences on his other 127 convictions.

Webb appeals his 130 convictions, arguing that: (1) the district court gave erroneous instructions to the jury, (2) he received ineffective assistance of trial counsel, and (3) the government's evidence was insufficient to sustain his convictions. After oral argument and careful review of the briefs and record, we affirm.

## I. INDICTMENT

On December 22, 2008, a grand jury issued a 131-count indictment[1] charging Webb with: (1) conspiring (with his wife, Bonnie Faye Webb ("Faye")) to defraud a health care benefit program and to commit wire fraud, in violation of 18 U.S.C. §§ 1343, 1347, 1349 (Count 1); (2) defrauding a health care benefit program, in violation of 18 U.S.C. §§ 1347 and 2 (Counts 2-36); (3) unlawfully

___

[1]Webb was acquitted on one count of the indictment.

dispensing and causing to be dispensed controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and 18 U.S.C. § 2 (Counts 39-106; 108-129); and (4) possessing and using, without lawful authority, a Drug Enforcement Administration ("DEA") registration number of another in connection with the distribution of controlled substances, in violation of 18 U.S.C. §§ 1028(a)(7) and 2 (Counts 130 and 131).

Count 37 charged Webb with health care fraud, and alleged that his fraud resulted in death, in violation of 18 U.S.C. §§ 1347 and 2. Count 38 charged Webb with conspiracy to unlawfully distribute numerous controlled substances, including oxycodone[2] and fentanyl,[3] and with death resulting from the use of oxycodone and fentanyl, all in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), 846. Count 107 charged Webb with unlawfully dispensing the controlled substances oxycodone and alprazolam,[4] and with death resulting from the use of the oxycodone, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), 841(b)(2), and 18

---

[2]Oxycodone is a powerful pain-reliever derived from opiates like morphine. It comes in immediate-release forms such as Percocet and continuous-release forms such as OxyContin. See United States v. Merrill, 513 F.3d 1293, 1300 n.5 (11th Cir. 2008).

[3]Fentanyl is the drug contained in Duragesic patches. Burnette v. Taylor, 533 F.3d 1325, 1330 n.3 (11th Cir. 2008). Fentanyl is a powerful synthetic opiate analgesic similar to, but more potent than, morphine.

[4]Alprazolam is a benzodiazepine that is often used to help reduce anxiety or help people sleep, and is branded, among other things, as Xanax. See Merrill, 513 F.3d at 1300 n.4.

U.S.C. § 2.[5] Because defendant Webb challenges the sufficiency of the evidence at trial, we review the evidence in detail.

## II. EVIDENCE AT TRIAL

### A. Webb's Prescribing Practices

Defendant Webb, a Florida-licensed physician, operated his medical practice in Destin, Florida, under the name "Doctors on Call."

Under Florida law, physicians are allowed to prescribe controlled medications for pain, but must do so "for a sound medical purpose" and "within the standard of care of a physician." The Florida State Board of Medicine has established seven standards that physicians who prescribe controlled substances for the treatment of pain must follow, including these five: (1) conducting a complete medical history and physical examination and documenting them in the medical record; (2) establishing a written treatment plan with objectives to determine whether the plan is working; (3) using written drug agreements for patients deemed at high risk for drug abuse; (4) referral of the patient to expert doctors "in order to achieve treatment objectives," especially when the patient has a history of substance abuse; and (5) keeping complete and accurate records. Fla. Admin. Code r. 64B8-9.013(3). At trial, witnesses testified that Webb prescribed

_____

[5]The indictment did not state the names of the victims.

4

controlled substances for patients whom he saw for less than fifteen minutes, and that those patients then would go straight to the pharmacy.

At trial, Dr. Theodore Parran ("Dr. Parran") was the government's expert witness in drug and alcohol dependency. Dr. Parran reviewed 115 to 120 patient files from Webb's practice. Based on those files, Dr. Parran concluded that Webb consistently violated the Florida Board of Medicine's standards. According to Dr. Parran, Webb: (1) gave inadequate initial evaluations, including failures to obtain prior medical records and sub-standard physical exams; and (2) failed to refer patients to specialists to help manage their pain. Webb also ignored signs of drug dependency in his patients and continued to prescribe drugs even when patients were "out of control with their self-taking of the medicine."

Dr. Parran's testimony, along with other testimony and documentary evidence, indicated that Webb prescribed multiple controlled substances in high doses, even where doing so made little medical sense. Dr. Parran testified that when Webb's patients had pain complaints, Dr. Parran could not recall any who were not treated with controlled substances, a practice he described as "very unusual." The government's evidence also indicated that even after Webb discovered some of his patients were addicts, he continued to feed their addictions by prescribing more controlled substances.

Dr. Parran also opined that Webb's prescribing practices were "dangerous," "[a]bsolutely incredible," and "clearly inconsistent with the usual course of medical practice and for other than legitimate medical purposes." Webb routinely granted patients' requests for early refills, even though such requests indicate that patients are not taking drugs as prescribed. Tellingly in Dr. Parran's view, Webb did not question the reasons his patients gave for needing early refills, which included: (1) a friend having stolen medication; (2) taking too much hydrocodone for cold sores; and (3) having flushed medication down the toilet. While patients sometimes legitimately need early refills, when this many patients ask for early refills it is "a huge red flag." Instead of granting those patients' requests, the better course is often to "ask them to get treatment."

Additional testimony and evidence at trial suggested that Webb continued to give his patients prescriptions for controlled substances even after Webb learned those patients were obtaining narcotics from other sources or sharing their drugs. For instance, Webb continued to prescribe multiple controlled substances to patient Kevin Morris and Morris's wife, even though Webb knew that Morris shared medication with his wife. Webb also prescribed 74 Adderall pills rather than the usual 60 to patient David Lee because Lee "has to pay back some people who he borrowed medications from." According to Dr. Parran, prescribing

6

narcotics under these types of circumstances "breaks basic rules of clinical decision making" because "people getting potentially addicting drugs from significant others, friends, family, acquaintances, and saying that they like them or they feel like they're the thing that works for them" is a major warning sign for physicians in general.

Despite warnings from relatives and close friends to Webb and his staff about various patients' drug abuse, Webb continued to prescribe those patients controlled substances. For instance, one patient's father told Webb that the patient had entered a drug rehabilitation facility, prompting Webb to note that the patient "will never get another prescription from our practice." Webb, however, prescribed Adderall to that patient less than nine months later. Dr. Parran stated that he could think of no good reason, aside from terminal illness, to give narcotics to someone who had been detoxed and was in recovery from an opiate addiction. One of Webb's medical assistants also testified that when she expressed her concerns to Webb, he dismissed her, saying "he did not put the pills in [his patients'] mouth[s], he just wrote the scripts that they needed."

Webb stood out to the pharmacists who filled his prescriptions because of the "amount and the frequency" of the prescriptions. Unlike other doctors, Webb kept his patients on pain medications for long periods, and also requested specific

7

brands of pain medicine because they worked better than generics. Dr. Parran

testified, however, that there is no medical reason to prescribe specific brands of

pain medicine rather than generics, and that his understanding is that patients seek

name-brand prescription medicines because those medicines have more street

value. Webb's patients also brought in prescriptions for early refills more

frequently than other doctors' patients. One pharmacist testified that some of

Webb's patients were "drug seekers," and that she had informed Webb that some

of Webb's patients were also getting pain medications from other physicians.

Based on his review of various patients' files, Dr. Parran concluded that

Webb's prescription practices were "done in a way that was inconsistent with the

usual course of medical practice and [were] done for other than legitimate medical

purpose." On cross-examination, Dr. Parran disagreed with Webb's counsel's

statement that "a caring doctor . . . would try to do anything they could to relieve

any type of pain that they believe their patient is suffering," explaining that:

> If in the process . . . of trying to relieve a patient's pain and
> suffering, a physician receives data, clinical information, calls from
> pharmacists, calls from probation officers, information about overdoses,
> information that patients are out of control with their medicine, running
> out early, seeing multiple different doctors for the same substances,
> using other illicit substances, so if in the process of trying to provide
> care for a patient's pain and suffering a physician receives data back
> indicating that that patient is out of control with their use and that their
> continued use threatens their health, their life, or their liberty, continuing

to prescribe to that patient in the face of that kind of adverse information coming back to the doctor is inconsistent with the practice of medicine. That constitutes knowingly doing harm to a patient in an ongoing way.

**B. Webb Practices During License Suspension**

The Florida State Board of Medicine suspended Webb's medical license for 30 days, beginning April 23, 2005, as a penalty for Webb's inappropriate prescribing of weight-loss drugs and Viagra over the Internet. During this suspension, Webb was not allowed to prescribe drugs or bill for office visits.

Webb arranged for another physician, Dr. Sally Ann Cooper ("Dr. Cooper"), to cover his practice during three weeks of the suspension. The weekend before the suspension started, however, Webb phoned in "lots and lots of prescriptions." After the suspension began, Webb continued to treat patients and write prescriptions. When pharmacists refused to fill those prescriptions because Webb's license was suspended, he reissued the prescriptions using Dr. Cooper's DEA registration number. Some of the prescriptions were dated the week before Dr. Cooper began to fill in at Webb's practice. At one point, Webb's wife Faye called in some prescriptions. When the pharmacist told Faye that Webb could not write prescriptions while he was suspended, Faye stated that Webb was not writing prescriptions and that she was phoning them in. When the pharmacist still refused to fill the prescription, Faye hung up. Shortly thereafter, Faye called the

9

pharmacy back and gave Dr. Cooper's name and DEA registration number to authorize a prescription for a controlled substance. Webb's practice also called in other prescriptions using Dr. Cooper's DEA registration number.

Dr. Cooper testified that she had not authorized these prescriptions or the use of her DEA registration number. Dr. Cooper learned that her number had been used without her authorization when a patient came in for a routine visit and told Dr. Cooper that her name was on the patient's prescription bottles despite their never having met. Further, the bottles "were dated before [Dr. Cooper] had started working" at Webb's medical practice. After doing some investigation on her own, Dr. Cooper filed an official complaint with the Florida State Board of Medicine.

## C. Fraudulent Claims to Health Care Benefit Programs

Evidence introduced at trial indicated that Webb submitted claims for office visits and procedures during his 30-day suspension and caused pharmacies to submit claims based on unauthorized prescriptions. In some cases, Dr. Cooper saw a patient, but Webb submitted the claims under his own name. In another case, Webb saw a patient on April 25 but backdated the claim to April 22.

Representatives from Blue Cross/Blue Shield of Florida, TRICARE (the health benefit plan for armed services members), and companies that contracted with Medicare and Medicaid testified that the insurers would not pay claims if

they knew that the services were provided (or the prescriptions were written) while a physician's license was suspended. Webb's experts agreed that physicians should not see patients, write prescriptions, or bill for office visits while suspended from the practice of medicine.

The insurance company representatives similarly confirmed that their companies would not pay for medication that was without legitimate medical purpose. TRICARE's representative stated that "the fact that the physician is ordering a service or a prescription drug and that is causing a claim to be submitted to the U.S. Government, that would be considered the same as saying that these services are medically necessary to treat the patient."

## D. Death of Patient Victoria Ross

Before patient Victoria Ross first saw Webb, she ran her own business and supported her family. Before she first encountered Webb professionally, Ross took Lortab for her back pain, but neither the medicine nor the pain interfered with her ability to function.

Ross's sons testified at trial that they noticed changes in her appearance and behavior after she became Webb's patient and he prescribed her OxyContin. Ross stopped caring as closely for her son, lost significant amounts of weight, and even lost her business. These changes were evident not only to Ross's family, but to

11

outsiders as well.

According to her husband, Ross eventually became addicted to the oxycodone Webb prescribed and injected it intravenously. Ross routinely asked for and received early prescription refills, despite Webb's notations in Ross's file that he would refuse to issue early refills. Over the course of his treating Ross, Webb became aware that Ross was seeing and getting drugs from other doctors, but relied on her representations that she would see only Webb going forward.

Pharmacists also gave Webb indication that his prescription practices might be contributing to Ross's misuse of drugs. However, when one pharmacist refused to fill a prescription because it was too early, Webb called another pharmacy to have the prescription filled there. Webb also continued to call in prescriptions for Ross after a pharmacy alerted him to the possibility that Ross may have altered a prescription for OxyContin. Webb failed to contact a family doctor who a pharmacy told him was also prescribing OxyContin and Lortab for Ross.

Although Webb knew that Ross had been hospitalized for endocarditis, a heart valve infection that can indicate IV drug usage, he did not request medical records from her hospitalizations. Those records would have revealed that the cause of Ross's endocarditis was in fact IV drug usage. However, when Ross got out of the hospital and asked Webb to prescribe the same drugs she was on prior to

her hospitalizations, Webb wrote that he had "'no problem with that'" because Ross was a "responsible and compliant patient."

After being absent from early 2004, Ross returned to Webb's office in the summer of 2004 complaining of increased lower back pain. Webb took no additional history, but simply prescribed 28 tablets of OxyContin 40 mg, 28 tablets of Percocet 10 mg, 30 tablets of Xanax 2 mg, the highest available strength, and 30 tablets of Soma. Although he was not referring specifically to Ross, the government's expert explained that it is dangerous to prescribe the same amount of drugs to a patient following a gap between visits without documentation of "someone else . . . prescribing in the intervening period and the patient still [having] the same tolerance" because of the risk that "a patient has lost their tolerance" for the medication, which could cause an accidental overdose.

Ross filled the August 15 prescriptions on August 15 and 16, 2004. Ross collapsed on August 25, 2004, and died at the Fort Walton Beach Medical Center on August 27. The medical examiner determined that the cause of death was "acute oxycodone intoxication." Despite the fact that Ross had an unhealthy heart, the medical examiner determined that an accidental drug overdose was the more likely cause of death because: (1) of Ross's long history of drug abuse and (2) Ross's heart was restored to a normal rhythm after she collapsed, which is unusual

13

in cases of heart death. Dr. Parran stated that Webb's prescription practices as to Ross were "inconsistent with the usual course of medical practice and appear[] to be for other than legitimate medical purpose and, to within a reasonable degree of medical certainty, [were] direct contributor[s] to [Ross's] death."

**E. Death of Patient Terri Morris**

Webb first saw Trebble "Terri" Morris ("Terri") in 2000. Webb had already been treating her husband, Kevin Morris ("Kevin"), since August 1999. Kevin abused the drugs Webb prescribed for him. One of Terri's previous doctors testified that he had dismissed her from his practice in the mid-1990s because he was uncomfortable having her as a patient. The reasons for his discomfort included Terri's seeking drugs from emergency rooms, refusing drug rehabilitation and other forms of help, and inappropriately using narcotics.

At her first office visit with Webb, Terri "reported no medical problems, except for migraines and bipolar or manic depressive disorder . . . and she reported to be on no medicines." In addition to other medicines, Webb prescribed five tablets of OxyContin 20 mg. Pharmacy expert Paul Doering testified that "OxyContin is a terrible choice" for treating migraine headaches because OxyContin's controlled release does not do a good job combating the acute pain caused by migraines. Dr. Parran opined that prescribing opiates to treat headaches

14

is discouraged because opiates may cause another headache.

Terri and Kevin both frequently requested early refills. On one occasion, to justify his early refill, Kevin told Webb that Terri was stealing his medicines. After the stealing incident, Webb advised Terri and Kevin not to use each other's medicines, but continued prescribing them narcotics without mentioning the issue again. Both Morrises abused the Duragesic (fentanyl) patch that Webb prescribed Kevin by poking holes in the patch and squeezing the substance into their mouths to get high. Webb knew that Terri had hepatitis C, which most commonly results from IV drug abuse, but did not ask Terri how she had contracted the disease. Despite these signs of drug abuse, Webb continued to prescribe controlled substances to Terri up until her death on September 9, 2003.

Terri and Kevin staggered their visits to Webb to ensure that they would have a steady supply of narcotics. On September 5, 2003, Webb prescribed 30 alprazolam (Xanax), 75 Soma tablets, and 50 Darvocet tablets to Terri. On September 9, Webb prescribed, inter alia, 15 Duragesic patches to Kevin. When Kevin found Terri's dead body, she had one of the Duragesic patches on her body, and he found several more in the trash with pinpricks in them. Stephen Spinella, a detective with the Fort Walton Beach Police Department, contacted Webb after seeing Webb's name on the pill bottles in Terri's room. Webb told Detective

15

Spinella that he had no indication that Terri was sharing medications with her husband, that he had no indication that she was suicidal, and that as far as Webb knew, Terri took the medications as prescribed.

The toxicology report done after Terri's death revealed significant levels of fentanyl and alprazolam in her blood. The toxicologist testified that the level of fentanyl in Terri's blood indicated misuse of the Duragesic patch, was consistent with ingesting or injecting the patch's contents, and that putting such a high level of fentanyl into the body "would be immediately fatal." Terri's blood contained varying amounts of other drugs, and the cause of her death was "complications of polypharmacy," or "multiple drug intoxication."

Based on his review of the two Morrises' medical files, Dr. Parran opined that Webb's "prescribing appears to have been done inconsistent with the usual course of medical practice and appears to have been for other than legitimate medical purpose." Importantly, "the prescribing played a contributory role in [Terri Morris's] death." Dr. Parran further noted that Terri's history and behavior "require[d] intervention and - - and a changing of prescribing at that moment." However, Webb's "prescribing was absolutely unchanged after the husband reported [Terri's stealing his medications], up until the time of [Terri's] death."

F. Death of Patient Gena Ortega

16

Webb's patient Gena Ortega ("Ortega") was a dental hygienist who had successfully completed a drug rehabilitation program in 2001. According to Ortega's sister-in-law, after she got married Ortega was "a very professional person, loved her job and neat in her appearance, . . . and . . . seemed to be just in good general spirits." After Ortega began seeing Webb, she became moody, had little energy, and could not hold down a job. Ortega had burn marks on her legs and on the furniture in her home from where she allowed the cigarettes she was smoking to drop from her mouth and smolder.

Webb treated Ortega for back pain intermittently from July 2004 until her death in April 2007. Ortega's husband testified that he drove her to two of her appointments with Webb, during which she was in Webb's office for less than 15 minutes and went directly to the pharmacy afterwards.

In December 2004, Ortega told Webb that she had taken too many pills and therefore had run out of her prescription ten days early, and Webb phoned in a new prescription for her. On March 23, 2005, Webb noted that Ortega "'requests some medication to unwind at the end of the day,'" so Webb prescribed her what Dr. Parran described as a "whopping" 1 mg dose of Klonopin. Dr. Parran opined that "[u]nwind at the end of the day is not a diagnosis," and is "certainly not a legitimate medical purpose for a Schedule IV benzodiazepine to be prescribed."

17

Ortega obtained an early refill from Webb in April 2005 and Webb sent her for a pain consult in May 2005. After a five-month absence, Ortega came back to Webb in October 2005, and Webb prescribed her Klonopin and Lortab at the same levels as before.

According to pharmacy databases in the area where Webb practiced, Webb continued to prescribe Lortab for Ortega on a monthly basis until April 19, 2007. That same day, Webb also prescribed generic Soma and Endocet. Ortega died on April 22, 2007. Among other things, Ortega's toxicology report showed the presence of hydrocodone and alprazolam, which resulted in "a synergistic effect." The medical examiner concluded that the cause of Ortega's death was "toxic effects of hydrocodone and other drugs," which essentially caused her to accidentally choke on her own vomit. Dr. Parran testified that Webb's "prescribing appeared to be inconsistent with the usual course of medical practice and appeared to have been for other than legitimate medical purpose and was a contributing factor to [Ortega's] death."

At the close of the government's evidence, Webb made a motion for acquittal, which the district court denied. Webb did not renew this motion at the close of the evidence.

## G. Webb's Trial Evidence

Webb's first trial witness was Dr. Richard L. Rauck ("Dr. Rauck"). Dr. Rauck, an expert in anesthesiology and pain management, testified that Webb was writing prescriptions appropriate for his patients' conditions, and that his prescribing practices were within the professional bounds of medical practice. Dr. Rauck stated that in cases where he has testified for the Department of Justice that other doctors conducted themselves outside the bounds of medical practice, it was his experience that the accused doctors did not treat infections and other conditions. In Dr. Rauck's opinion, Webb's prescribing patterns did not fit with those of other doctors prosecuted for inappropriately prescribing controlled pain medications.

Dr. Rauck further testified that opioids can appropriately be prescribed for patients with drug abuse histories. Dr. Rauck testified that Webb did refer patients to pain management clinics for treatment. In his review of Webb's files, Dr. Rauck did not see any intent on Webb's part to get his patients addicted to narcotics.

Dr. Rauck testified specifically on each of the three patients in whose deaths Webb was implicated. He opined that Terri Morris had an extraordinary level of fentanyl in her system when she died, and that such a high level could not have come from a prescribed dose. He also noted that Webb did not prescribe fentanyl

for Terri, but only for her husband, and testified that it was not unusual for Webb to have prescribed OxyContin to treat Morris's headaches.

As to Gena Ortega, Dr. Rauck testified that she had been on "stable doses of hydrocodone, so one would not have expected that to have caused her death." He stated that the levels of hydrocodone found in her blood at death should not have been lethal. Dr. Rauck also found it compelling that Ortega had a sixty percent lesion of one coronary artery and a forty percent lesion of another coronary artery, which he posited was a possible reason for a cardiac event that could have caused Ortega's death.

Dr. Rauck also reviewed Victoria Ross's file, which he said demonstrated "narrowing in [the] coronary arteries" that could possibly have caused her death. Dr. Rauck opined that Ross "clearly had sustained a miocardial [sic] infarction rather acutely within days or hours before her ultimate death." He also testified that if Ross took her OxyContin as prescribed "it would be hard for [him] to understand that that would be the cause of death." Dr. Rauck disagreed with the medical examiner that acute oxycodone intoxication was likely the cause of Ross's death, concluding that her heart condition was a more likely cause.

Webb testified in his own defense. He stated that he took patients other doctors were unwilling to see, and that he is very frustrated by his arrest and trial.

20

He also never intended to defraud anyone.

Webb did not know that Victoria Ross was going to other doctors to get medicine, and was not treating Ross for her heart problems. Webb prescribed Ross OxyContin shortly before she died, but did not realize how desperate her situation was. As to Ortega, she would not have died if she had taken the amount of drugs Webb prescribed her. Webb never prescribed fentanyl to Terri Morris, and when he found out that she and her husband were sharing drugs, he would have had a "very significant conversation" with them (although he did not claim to remember such a conversation specifically).

After the defense rested, the district court instructed the jury on all counts.

## III. JURY INSTRUCTIONS

Section 841(b)(1)(C) provides for an enhanced penalty for unlawful dispensing of a controlled substance if death "results from the use of such substance." 21 U.S.C. § 841(b)(1)(C). Section 1347(a) provides for an enhanced penalty for health care fraud "if the violation results in death." 18 U.S.C. § 1347(a).[6]

Webb requested a jury instruction on the three death-results Counts—37,

---

[6]At the time of trial, § 1347 had the same language, but did not have subsections (a) and (b). Later legislative changes made what was in § 1347 now § 1347(a) and added subsection (b).

38, and 107. Webb's proposed jury instruction stated that the government must prove that (1) his conduct "directly" and "in continuous sequence produced[,] or contributed substantially to producing, the death," and (2) that "but for" his conduct, the death would not have occurred. His instruction stated:

> In order to establish that a death "resulted" from the Defendant's conduct, the government must prove beyond a reasonable doubt that the Defendant's conduct directly and in natural and continuous sequence produced or contributed substantially to producing the death, so that it can be said that "but for" the Defendant's conduct, the death would not have occurred.

The district court did not give Webb's proposed instruction but gave different charges on the counts. We review the district court's jury instructions and Webb's requested instruction in the context of each statute separately. The principal issue concerns the wording of the jury instruction as to the statutory terms "results from" contained in § 841(b)(1)(C) (Counts 38 and 107) and "results in" contained in § 1347(a) (Count 37).

### A.    21 U.S.C. § 841: Counts 38 and 107

As we noted earlier, Count 38 charged Webb with conspiracy to unlawfully distribute numerous controlled substances, including oxycodone and fentanyl, and with death (Terri Morris's and Victoria Ross's) resulting from the use of oxycodone and fentanyl, all in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and

22

846.[7] Count 107 charged Webb with unlawfully dispensing the controlled substances oxycodone and alprazolam, and with a death (Victoria Ross's) resulting from the use of the oxycodone, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), (b)(2), and 2.

We start with the language of the applicable statute. Section 841(a) states that: "it shall be unlawful for any person knowingly or intentionally . . . to . . . dispense[] a controlled substance . . . ." 21 U.S.C. § 841(a). Section 841(b) provides an enhanced penalty "if death . . . results from the use of such substance," as follows:

> (b) Penalties
> Except as otherwise provided . . . , any person who violates subsection (a) of this section shall be sentenced as follows:
> ...
> such person . . . if death or serious bodily injury results from the use of such substance shall be sentenced to a term of imprisonment of not less than twenty years or more than life . . . .

21 U.S.C. § 841(b)(1)(C) (emphasis added).

The dispute in this case centers on whether § 841(b)(1)(C)'s enhanced penalty requires the jury to find (1) merely that the patient's use of the controlled substance (unlawfully prescribed by Webb) was the actual cause of death; or (2)

---

[7]The indictment does not specify whose death resulted from the use of which drugs; it does not even mention the names of the victims. Evidence adduced at trial indicates that Morris died from the use of fentanyl and Ross died from the use of oxycodone.

that Webb's conduct proximately caused the death or at least that the death was reasonably foreseeable to Webb.

As to the § 841 offenses (Counts 38 and 107), the district court instructed there was no foreseeability or proximate cause requirement, and that instead the government must prove that "but for" (had it not been for) the victim's ingesting of the drugs charged in the indictment, the victim would not have died. The district court's instruction stated:

> Similarly, as it concerns Counts 38 and 107, the law provides that whenever death or serious injury is a result of the victim's use of a controlled substance that has been distributed or dispensed by the Defendant, a more serious offense is committed, regardless of whether the defendant knew or should have known that death would result.

> There is no requirement that the death resulting from the use of the controlled substance dispensed was a reasonably foreseeable event, or that the controlled substance was the proximate cause of the death. This standard is satisfied upon a finding by you that, but for the victims ingesting the controlled substances charged in the indictment, the victims would not have died.

> Therefore, you are to determine as follows:

> ...

> Whether in Count 38 the death of Trebble Morris resulted from the use of fentanyl and whether the death of Victoria Ross resulted from the use of oxycodone that Defendant had caused to be dispensed, between in or about December, 2002 and on or about September 13, 2007.

24

Whether in Count 107 the death of Victoria Ross resulted from the use of oxycodone that the Defendant caused to be distributed or dispensed, between on or about August 15, 2004 and on or about August 16, 2004.

On appeal, Webb contends that the district court (1) erred in refusing his requested instruction and (2) should have instructed that, to find Webb responsible for the deaths, it had to find "proof of actual cause and effect" between Webb's own conduct and his patients' deaths.[8] Webb submits that "[l]egal causation (proximate cause and foreseeability) is a fundamental principle of jurisprudence and it should have been part of the government's burden of proof for all three deaths—Congress has not stated otherwise."

We disagree. Rather we join several of our sister circuits and hold that § 841(b)(1)(C)'s enhanced penalty requires only proof that the death resulted from the victim's use of a controlled substance dispensed by the defendant. See United States v. De La Cruz, 514 F.3d 121 (1st Cir. 2008); United States v. Houston, 406

---

[8]Webb challenges both the failure to give his instruction and the instruction the district court gave instead. We review a district court's rejection of a proposed jury instruction for abuse of discretion. Merrill, 513 F.3d at 1305. "The district court has broad discretion in formulating jury instructions as long as those instructions are a correct statement of the law." Id. (quotation marks omitted). We will reverse the district court's refusal to incorporate a requested jury instruction "only if the proffered instruction was substantially correct, the requested instruction was not addressed in the charges actually given, and failure to give the instruction seriously impaired the defendant's ability to present an effective defense." Id. (quotation marks omitted).

We review the legal correctness of the jury instruction actually given de novo. United States v. Prather, 205 F.3d 1265, 1270 (11th Cir. 2000). Jury instructions are subject to harmless error review. See Davis v. Kemp, 752 F.2d 1515, 1520-21 (11th Cir. 1985) (en banc).

F.3d 1121 (9th Cir. 2005); United States v. McIntosh, 236 F.3d 968 (8th Cir. 2001); United States v. Robinson, 167 F.3d 824 (3d Cir. 1999); United States v. Patterson, 38 F.3d 139 (4th Cir. 1994).  We discuss these decisions in depth, as some focus on foreseeability and others on proximate cause.[9]

**1.      United States v. Patterson, 38 F.3d 139 (4th Cir. 1994)**

In Patterson, the Fourth Circuit held that reasonable foreseeability is not an element of the death "results from" sentence enhancement in § 841(b)(1)(C). Patterson, 38 F.3d at 145.  The two defendants in Patterson pled guilty to unlawful distribution of controlled substances, but reserved the right to contest at sentencing whether victim Carroll's death resulted from their distribution of controlled substances.  Id. at 141.[10] The sentencing court found that Carroll's death resulted from the drugs brought by defendant Patterson to the party.  Id. at 141-42.

On appeal, the defendants argued that the district court erred in not requiring the government to prove that Carroll's death was a foreseeable result of

---

[9] While Webb has not directed us to any definition of the two terms, foreseeability is widely defined as an element of proximate cause.  See Black's Law Dictionary 721 (9th ed. 2009) ("Foreseeability, along with actual causation, is an element of proximate cause in tort law.").

[10]Carroll attended a party at Defendant Laythe's residence.  Patterson, 38 F.3d at 142. Defendant Patterson brought controlled substances to the party, "including Demerol, Mepergan, morphine sulfate, and Valium, all in tablet or capsule form."  Id.  Carroll later took some of the pills Patterson gave to Laythe, and injected some heroin that Patterson melted down.  Id. Everyone involved went to sleep, and when Patterson and Laythe awoke, they found Carroll dead.  Id.

26

the defendants' distribution of controlled substances before applying the enhanced penalty in § 841(b)(1)(C). Id. at 142-43. The defendants argued that "(1) the statute imposes a 'reasonable foreseeability of death' requirement, and (2) the Government failed to provide sufficient evidence to prove that the death of Carroll was, in fact, a reasonably foreseeable consequence of their actions." Id. at 145.

Rejecting this claim, the Fourth Circuit concluded that "because we find that § 841(b)(1)(C) imposes no reasonable foreseeability requirement, we need not address the question whether Carroll's death was reasonably foreseeable" to the defendants. Id. The Fourth Circuit explained that "the plain language of § 841(b)(1)(C) does not require, nor does it indicate, that prior to applying the enhanced sentence, the district court must find that death resulting from the use of a drug distributed by a defendant was a reasonably foreseeable event." Id. Instead, "[t]he statute puts drug dealers and users on clear notice that their sentences will be enhanced if people die from using the drugs they distribute." Id.

The Fourth Circuit concluded that: "Where serious bodily injury or death results from the distribution of certain drugs, Congress has elected to enhance a defendant's sentence regardless of whether the defendant knew or should have known that death would result." Id. The Fourth Circuit refused to "second-guess [Congress's] unequivocal choice." Id.

27

## 2.    United States v. Robinson, 167 F.3d 824 (3d Cir. 1999)

The Third Circuit concluded that § 841(b)(1)(C) does not require proof that a defendant's actions are the proximate cause of a victim's death.  Robinson, 167 F.3d at 826.  Defendant Robinson delivered heroin to Bungar, who delivered it to Allison, who died of a heroin overdose.  Id. at 826-27.  The jury convicted Robinson of conspiring to distribute heroin.  The sentencing court "concluded that Robinson distributed heroin that resulted in Allison's . . . death," and imposed the mandatory minimum 20-year sentence in § 841(b)(1)(C).  Id. at 827.

On appeal, defendant Robinson contended that § 841(b)(1)(C) "requires a 20-year mandatory minimum only if a court finds that the distribution of the substance was in the common law sense the proximate cause of death or serious bodily injury."  Id. at 826. In other words, "even though Robinson acknowledges that a user of the heroin he supplied died from its use, he challenges the sentence because the district court did not make a finding that his conduct was a proximate cause of the user's death."  Id.

Looking to Patterson for guidance, the Third Circuit stated "the [Fourth Circuit] explained that the 'statute puts drug dealers and users on clear notice that their sentences will be enhanced if people die from using the drugs they distribute.'"  Id. at 830 (quoting Patterson, 38 F.3d at 145).  After quoting the

28

Fourth Circuit's explanation that "it would 'not second-guess [Congress's] unequivocal choice,'" id. (quoting Patterson, 38 F.3d at 145), the Third Circuit said that "[w]e will not either." Id. Instead, "[w]here, as here, Congress' language is 'plain and unambiguous,' we simply apply the language of the statute as written." Id. at 830-31.

The Third Circuit added that "[i]n the circumstances, it would be sophistry to say that Allison's death did not result from the use of the heroin delivered pursuant to the conspiracy." Id. at 831. The Third Circuit emphasized that "we are applying a statute dealing with a discrete problem, the distribution of controlled substances, products which Congress recognized will in some cases cause death or serious bodily injury." Id. "Congress recognized that the risk is inherent in the product and thus it provided that persons who distribute it do so at their peril." Id.

In sum, "[i]t is obvious Congress intended in such a case that the 20-year mandatory minimum would apply if death or serious bodily injury resulted from the use of the substance without regard for common law proximate cause concepts." Id. Although acknowledging that there might be some limiting principles on application of the enhancement, the Third Circuit stated that "[i]f section 841(b)(1)(C) is not to be applied as presently written, Congress and not

29

this court should narrow its application." Id. at 832.

### 3. United States v. McIntosh, 236 F.3d 968 (8th Cir. 2001)

In McIntosh, the Eighth Circuit similarly concluded that the enhanced penalty in § 841(b)(1)(A) did not have a foreseeability or a proximate cause requirement.[11] McIntosh, 236 F.3d at 972. Defendants McIntosh and McMillan conspired to produce methamphetamine. Id. at 970. McIntosh shared his methamphetamine with Jean Creswell, who lived with him, and with her niece Amy Creswell. Id. Some of this methamphetamine eventually reached Jessica Smith, Jean's fourteen-year-old daughter, even though McIntosh had specifically instructed his friends not to give Jessica methamphetamine. Id. Jessica died after using the methamphetamine. Id.[12]

The district court determined that: "1) Jessica's death resulted from the use of methamphetamine; 2) the methamphetamine used by Jessica . . . came from

---

[11]The relevant wording of § 841(b)(1)(A), which applies to different controlled substances, is the same as the enhanced penalty in § 841(b)(1)(C):
> (1)(A) In the case of a violation of subsection (a) . . .
> ...
> such person shall be sentenced to a term of imprisonment which . . . if death or serious bodily injury results from the use of such substance shall be not less than 20 years or more than life . . . .

21 U.S.C. § 841(b)(1)(A) (emphasis added).

[12]McIntosh pled guilty to conspiracy to manufacture methamphetamine. McIntosh, 236 F.3d at 970. His plea agreement "left open for the district court's determination at sentencing whether McIntosh was subject to an enhanced sentence because of Jessica's death." Id. at 970-71.

either Amy Cresswell, Jean Creswell, or McMillan;[] and 3) regardless of which of the three supplied the methamphetamine, it 'originally came' from McIntosh." Id. at 971. The district court also found that the "government failed to prove that McIntosh directly furnished Jessica with methamphetamine nor [sic] that he had any knowledge she was being supplied with the drug by the others." Id.

Despite the latter two findings, "the district court concluded McIntosh was subject to the enhancement because he played a part in manufacturing the drug [Jessica] did use," and sentenced him to twenty years' imprisonment. Id. On appeal, McIntosh contended that § 841(b)(1)(A) permits a sentence enhancement only if death "was a reasonably foreseeable result of, or was proximately caused by, a defendant's conduct," and that he did not proximately cause Jessica's death and could not reasonably have foreseen it. Id.

The Eighth Circuit explained that "[t]he starting point for ascertaining the intended meaning of any statute is the language of the statute itself." Id. The statute's "language is unambiguous and . . . giving effect to its plain meaning prohibits us from superimposing upon the statute a foreseeability or proximate cause requirement." Id. at 972. The Eighth Circuit "decline[d] to hinder Congress's will, apparent from the face of the statute, through a judicial pronouncement that the statute requires more than it says."

Id.

The Eighth Circuit agreed with the Third and Fourth Circuits' conclusions "that Congress intended § 841(b)(1)(A)'s enhancement to apply without regard to the principles of proximate cause or the foreseeability of death or serious bodily injury." Id. at 972-73. The Eighth Circuit acknowledged that "[o]ur conclusion that the statute imposes strict liability upon McIntosh for Jessica's death vitiates [McIntosh's] argument" that the enhanced sentence only applies if the defendant intends to cause death or knowingly risks death. Id. at 974.[13]

### 4. United States v. De La Cruz, 514 F.3d 121 (1st Cir. 2008)

In De La Cruz, the First Circuit also concluded that § 841(b)(1)(A)'s enhanced penalty does not require the government to prove foreseeability. De La Cruz, 514 F.3d at 138. A jury convicted defendant De La Cruz of conspiracy to distribute heroin and possession with intent to distribute heroin, in violation of 21 U.S.C. §§ 841(a)(1), 846. Id. at 125. De La Cruz sold heroin to Tracy, who sold

---

[13]Other circuits have also opined that § 841(b)(1)(C) (or provisions with similar language) creates a strict liability regime. See United States v. Carbajal, 290 F.3d 277, 283 (5th Cir. 2002) (interpreting sentencing guideline with similar "death . . . resulted from" language to § 841(b)(1)(C) and determining that it "is a strict liability provision that applies without regard for common law principles of proximate cause or reasonable foreseeability"); United States v. Rebmann, 226 F.3d 521, 522, 525 (6th Cir. 2000) (indicating in dicta that § 841(b)(1)(C) "[o]n its face, . . . is, in effect, a strict liability statute with respect to the injury or death of another arising out of the distribution of drugs"), overruled on other grounds by United States v. Leachman, 309 F.3d 377, 385 n.9 (6th Cir. 2002).

32

some of that heroin to Flynn, who sold some to Wallace. Wallace later died in his home of heroin use. Id. at 126. At trial, the district court instructed the jury that it:

> [M]ust find, beyond a reasonable doubt, that Wallace ingested heroin, that this heroin was a "but for" cause of Wallace's death, and that this heroin was distributed as part of the conspiracy charged in Count One and passed through Defendant's hands as part of the distribution charged in Count Two.

Id. at 137.

On appeal, De La Cruz argued that the jury should have been instructed that, before finding him eligible for the enhanced penalty, it had to find that Wallace's death was foreseeable to him. Id. at 136. Rejecting De La Cruz's claim, the First Circuit noted that "[n]othing in the language of the statute suggests that a death must be foreseeable before the enhanced penalty provision applies." Id. at 137. Instead, "[w]hat is required under the death-enhancing statute is that the government prove cause-in-fact, that is, that the decedent's death was caused in fact by his or her use of drugs that were distributed either by the defendant himself or by others in a conspiracy of which the defendant was a part." Id. at 138. In De La Cruz's case, "the district court properly instructed the jury about the required proof of cause-in-fact, and-following the court's instructions-the jury specifically found that Wallace died as a result of ingesting heroin that was

33

distributed during the course of the charged offenses by Defendant [De La Cruz]

to Wallace through Tracy and Flynn." Id.; see United States v. Hatfield, 591 F.3d

945, 947-48 (7th Cir. 2010) (discussing different types of causation and noting the

"parties agree that the statutory term 'results from' required the government to

prove that ingestion of the defendants' drugs was a 'but for' cause of the deaths

and the bodily injury" and "[t]he death or injury need not have been

foreseeable").[14]

## 5.    United States v. Houston, 406 F.3d 1121 (9th Cir. 2005)

In Houston, the Ninth Circuit concluded that proximate cause is not a

required element of § 841(b)(1)(C)'s enhanced penalty. Houston, 406 F.3d at

1122-23. The jury convicted defendant Houston of distributing methadone to

Bradford, who died. Id. at 1121. The district court instructed the jury that "the

Government was required to prove beyond a reasonable doubt that 'the

---

[14]The error alleged in Hatfield was not that the district court charged the statutory language that the government must prove the victim died "as a result of ingesting a controlled substance . . . distributed by the defendants." 591 F.3d at 947. The error was the added part of the charge which stated the controlled substances had to have been "a factor that resulted in death" and "although they need not be the primary cause of death . . . they must at least have played a part in the death." Id. (quotation marks omitted). The Seventh Circuit concluded that:

> The defendants' objection to the instruction was well taken. All that would have been needed to satisfy it was to eliminate the addition to the statutory language, which was a good deal clearer than the addition and probably clear enough. Elaborating on a term often makes it less rather than more clear . . . .

Id. at 949.

defendant's act was a proximate cause of . . . Bradford's death.'" Id. at 1123.

The Ninth Circuit determined that "[t]o the extent that this instruction suggested that Bradford's death had to have been a foreseeable result of [defendant] Houston's act, the instruction required the Government to prove more than the statute requires, and was therefore in error." Id. (footnote omitted). The Ninth Circuit reasoned that "[t]he addition of proximate cause as an element necessary for invoking the twenty-year minimum sentence described in § 841(b)(1)(C) is inconsistent with the statutory language, our circuit's related precedent, and the conclusions of every other federal court of appeals to consider the issue." Id. The Ninth Circuit cited Patterson, McIntosh, and Robinson to support its conclusion that neither foreseeability nor proximate cause is required to support the enhanced penalty in § 841(b)(1)(C). See Houston, 406 F.3d at 1124.

The Ninth Circuit added that, (1) "[a]ll that is necessary under the statutory language is that 'death ... results' from the offense described in § 841(a)(1)," and (2) "[c]ause-in-fact is required by the 'results' language, but proximate cause, at least insofar as it requires that the death have been foreseeable, is not a required element." Id. at 1125. The Ninth Circuit determined that the district court erroneously instructed the jury that proximate cause was a required element of § 841(b)(1)(C), but found the error harmless and upheld defendant Houston's

35

conviction and sentence. Id. at 1125-26.

With this background, we turn to the jury instructions at Webb's trial.

### 6. Jury Instruction at Webb's Trial

"The starting point for all statutory interpretation is the language of the statute itself . . . ." Med. Transp. Mgmt. Corp. v. Comm'r, 506 F.3d 1364, 1367 (11th Cir. 2007) (quotation marks omitted); Harris v. Garner, 216 F.3d 970, 972 (11th Cir. 2000) (en banc) ("[C]ourts should always begin the process of legislative interpretation . . . with the words of the statutory provision."). "[O]ur task is to determine whether the language at issue has a plain and unambiguous meaning with regard to the dispute in the case. Our inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent." Med. Transp. Mgmt. Corp., 506 F.3d at 1368 (quotation marks and citation omitted).

Here, § 841(b)(1)(C) imposes an enhanced penalty whenever "death or serious bodily injury results from the use of" the controlled substance. 21 U.S.C. § 841(b)(1)(C). We agree with our sister circuits that the plain and unambiguous language of § 841(b)(1)(C) contains no foreseeability or proximate cause requirement. De La Cruz, 514 F.3d at 138; Houston, 406 F.3d at 1122; McIntosh, 236 F.3d at 972; Robinson, 167 F.3d at 826; Patterson, 38 F.3d at 145. The

36

government is not required to prove a defendant's conduct proximately caused the victim's death or that the death was reasonably foreseeable to the defendant. Rather, under § 841(b)(1)(C), the government must prove only that the death "results from" the victim's use of a controlled substance charged in the indictment. We apply the language of the statute as written. The statute requires a cause-in-fact connection between the victim's ingestion of the drugs and death. It does not require that the defendant's conduct proximately cause the death.

Accordingly, in Webb's case, we find no error in the district court's jury instruction regarding § 841(b)(1)(C), nor any error in the district court's refusal of Webb's requested instruction. The district court properly instructed that the § 841(b)(1)(C) standard was satisfied upon a finding that, but for the victims ingesting the controlled substances charged in the indictment, the victims would not have died. This "but for" charge told the jury it had to find "but for" (had it not been for) the victim's ingestion, no death would have occurred. The statutory term "results from" is a cause-in-fact requirement that was met by the "but for" charge. Thus, as to § 841(b)(1)(C), the district court's jury instructions were correct, and Webb's requested instructions were not.

## B. 18 U.S.C. § 1347: Count 37

Count 37 charged Webb with healthcare fraud and with a death (Gena

Ortega's) resulting from that fraud, in violation of 18 U.S.C. §§ 1347 and 2.  Webb

once again argues that foreseeability and proximate cause are required elements of

§ 1347(a)'s enhanced penalty.  We turn to the language of the statute.  Section

1347(a) provides for an enhanced penalty for health fraud "if the violation results

in death," as follows:

> (a) Whoever knowingly and willfully executes, or attempts to execute, a
> scheme or artifice- -
>> (1) to defraud any health care benefit program; or
>> (2) to obtain, by means of false or fraudulent pretenses,
>> representations, or promises, any of the money or property owned
>> by, or under the custody or control of, any health care benefit
>> program,
>
> in connection with the delivery of or payment for health care benefits,
> items, or services, shall be . . . imprisoned not more than 10 years . . . .
> [I]f the violation results in death, such person shall be . . . imprisoned for
> any term of years or for life . . . .

18 U.S.C. § 1347(a) (emphasis added).

As to the § 1347(a) offense in Count 37, the district court instructed the jury

that a more serious offense is committed when death (1) is a result of the victim's

use of a controlled substance and (2) is connected to the delivery of, or payment

for, healthcare services in furtherance of the defendant's scheme to defraud, (3)

regardless of whether Webb knew or should have known that death would result.

The court's instruction stated:

38

As it pertains to Count 37, the law provides that whenever death or serious injury is a result of the victim's use of a controlled substance and is connected to the delivery of, or payment for, health care benefits, items, or services in furtherance of the Defendant's scheme to defraud, a more serious offense is committed, regardless of whether the Defendant knew or should have known that death would result.

...

Therefore, you are to determine as follows:

Whether in Count 37 the death of Gena Ortega resulted from the use of controlled substances in connection with the health care fraud violation charged in Count 37, on May 10, 2007.

Webb argues this instruction was erroneous.

Similar to § 841(b)(1)(C), Congress did not insert a foreseeability or proximate cause requirement into § 1347(a)'s penalty enhancement. Examining the statutory language, we see no principled way to distinguish between the "results in" language in § 1347(a) and the "results from" language in § 841(b)(1)(C), which we already have determined does not contain proof of foreseeability or proximate cause as required elements of the enhanced penalty. Rather, the results language in each statute requires nothing more than a causal connection factually.

The lack of foreseeability or proximate cause language in § 1347(a) is telling because Congress has included such language in numerous other criminal statutes, including statutes where the required connection is between the defendant's offense

conduct and death or bodily injury.  See 18 U.S.C. § 247(d)(2) (setting enhanced punishment for damaging religious property or obstructing free exercise where "bodily injury results to any person, including any public safety officer performing duties <u>as a direct or proximate result of conduct prohibited by this section</u>, and the violation is by means of fire or an explosive" (emphasis added)); <u>id.</u> § 247(d)(3) (setting enhanced punishment "for damaging religious property or obstructing free exercise where "bodily injury results to any person, including any public safety officer performing duties <u>as a direct or proximate result of conduct prohibited by this section</u>" (emphasis added)); <u>id.</u> § 844(d) (setting enhanced punishment for importation, manufacture, or distribution of explosive materials, where "personal injury results to any person, including any public safety officer performing duties <u>as a direct or proximate result of conduct prohibited by this subsection</u>" (emphasis added)); <u>id.</u> § 844(f)(2) (setting enhanced punishment for importation, manufacture, or distribution of explosive materials "and as a result of such conduct, <u>directly or proximately causes</u> personal injury or creates a substantial risk of injury to any person" (emphasis added)); <u>id.</u> § 844(f)(3) (setting enhanced punishment for importation, manufacture, or distribution of explosive materials "and as a result of such conduct, <u>directly or proximately causes</u> the death of any person" (emphasis added)); <u>id.</u> § 844(i) (setting enhanced punishment for damaging or destroying, by

40

means of fire or an explosive, any building, vehicle, or other real or personal property "if personal injury results to any person, including any public safety officer performing duties <u>as a direct or proximate result of conduct prohibited by this subsection</u>" (emphasis added)); <u>id.</u> §§ 2248(b)(3)(F), 2259(b)(3)(F), 2264(b)(3)(F), 2327(b)(3) (mandating restitution for losses "suffered by the victim <u>as a proximate result of the offense</u>" (emphasis added));[15] <u>id.</u> § 3286(b) (permitting charges on terrorism offenses at any time "if the commission of such offense <u>resulted in</u>, or created <u>a foreseeable risk of</u>, death or serious bodily injury" (emphasis added)); <u>id.</u> § 3663A(a)(2) (mandating restitution for persons "<u>proximately harmed as a result of</u> the commission of an offense" (emphasis added)); <u>id.</u> § 3771(e) (defining "crime victim" as, <u>inter alia</u>, "a person <u>directly and proximately harmed</u> as a result of the commission of a Federal offense" (emphasis added)); <u>see also</u> <u>id.</u> § 38(b)(2) (setting enhanced penalty for fraud related to aircraft parts where "the part to which the offense is related is <u>the proximate cause</u> of a malfunction or failure that results in serious bodily injury" (emphasis added)); <u>id.</u> § 38(b)(3) (setting enhanced penalty for fraud related to aircraft parts where "the

---

[15]<u>Cf.</u> <u>United States v. McDaniel</u>, 631 F.3d 1204, 1208-09 (11th Cir. 2011) (construing 18 U.S.C. § 2259—and rejecting the government's argument that proximate cause is not required—"because it is contrary to the plain language of section 2259, which covers, <u>inter alia</u>, 'losses suffered by the victim as a proximate result of the offense'" (quoting § 2259(b)(3)(F))).

41

part to which the offense is related is <u>the proximate cause</u> of a malfunction or failure that results in the death of any person" (emphasis added)).

As the Fourth Circuit noted in <u>Patterson</u>, "Congress understands how to place a reasonable foreseeability requirement into a sentencing enhancement provision and has explicitly done so in the past." <u>Patterson</u>, 38 F.3d at 145 n.7 (discussing 21 U.S.C. § 848(m)(4)). As this Court has emphasized, "[w]here Congress knows how to say something but chooses not to, its silence is controlling." <u>In re Griffith</u>, 206 F.3d 1389, 1394 (11th Cir. 2000) (<u>en banc</u>) (alteration in original and quotation marks omitted).

We recognize that the cause-in-fact connection in § 841(b)(1)(c) is between the use of the controlled substance and the death, and in § 1347(a), between the defendant's conduct and the death. However, there still is no foreseeability or proximate cause language in either statute. At bottom, § 1347(a) does not require the exacting legal proximate cause as formulated by Webb in his proposed charge. And there was no error in the district court's charge that the enhancement may apply "regardless of whether the Defendant knew or should have known that death would result."

We also recognize Webb relies on <u>United States v. Martinez</u>, 588 F.3d 301 (6th Cir. 2009), where the defendant Martinez was convicted of, <u>inter alia</u>, two

counts of health care fraud resulting in the death of two patients, in violation of 18 U.S.C. § 1347. 588 F.3d at 306.[16] The district court instructed the jury that, to convict Martinez of fraud resulting in death, it had to find that Martinez's fraud was the "proximate cause of the death of the two patients" before imposing the enhanced penalty under § 1347. Id. at 318. Martinez argued "that the Government failed to show that a rational jury could find that he caused their deaths." Id. at 317. Thus, the Sixth Circuit examined "the standard of causation required to show that such fraud 'result[ed] in death'" to determine "whether there [was] sufficient evidence to support [Defendant] Martinez's conviction as to these two counts." Id. (first alteration in original).

The Sixth Circuit first noted that "[s]ection 1347 does not indicate the level of causation required to support application of its enhanced penalties, but other federal statutes elevate punishment when certain willful crimes 'result in death.'" Id. After reviewing several similar statutes and circuit-level decisions interpreting them, the Sixth Circuit concluded "that proximate cause is the appropriate standard to apply in determining whether a health care fraud violation 'results in death.'" Id.

---

[16]Martinez, an anesthesiologist, ran a pain-management clinic in Parma, Ohio. At trial, the government's theory was that Martinez "engaged in fraud and endangered his patients by omitting physical examinations, ignoring 'red flags' of painkiller addiction, giving appreciably more injections than were medically necessary or advisable, and providing at-risk patients with treatments that would leave them dependent on him for pain-suppressant prescriptions." Martinez, 588 F.3d at 307.

43

at 318-19. The Sixth Circuit's conclusion, however, was based on these three factors: (1) the "fundamental principle of criminal law" that "a person is held responsible for all consequences proximately caused by his criminal conduct"; (2) "Congress was aware of principles of legal causation when it determined that a health care fraud violation [that] results in death warrants an enhanced penalty"; and (3) notably, "the parties [did] not challenge the district court's determination that proximate cause is the appropriate standard of causation." Id. at 318 (alteration and quotation marks omitted). Upholding Martinez's convictions and the enhanced penalties, the Sixth Circuit found sufficient evidence demonstrated that Martinez (1) committed health care fraud in hurriedly giving patients injections and prescriptions and (2) that his actions proximately caused his two patients' deaths. Id. at 322-323. Ultimately, Martinez is materially distinguishable because the parties there did not "challenge the district court's determination that proximate cause is the appropriate standard of causation" and, as the evidence was sufficient to support Martinez's convictions even under the more stringent proximate cause standard, the level of causation required by the statute was not dispositive in any event. Id. at 318.[17]

_____

[17]In United States v. Rebmann, the Sixth Circuit stated in dicta that § 841's death-resulting sentence enhancement imposes strict liability. 226 F.3d 521, 525 (6th Cir. 2000) ("On its face, [21 U.S.C. § 841(a)(1)] is, in effect, a strict liability statute with respect to the injury or

Finally, although it may have been more prudent to charge exactly defendant Webb's "violation results in death" language of the statute, the district court did in fact charge that <u>the death</u> must be "connected to the delivery of, or payment for, health care benefits, items, or services <u>in furtherance of the Defendant's scheme to defraud</u>." (Emphasis added). Furthermore, there was overwhelming evidence (1) that the type of heath care fraud here involved Webb's prescribing controlled substances for other than legitimate medical purposes, and having pharmacies submit claims for reimbursement to health insurers on the basis of his prescriptions; and (2) that Ortega's death stemmed from taking those prescribed drugs for which reimbursement was sought. Accordingly, given the overwhelming evidence in this case, the particular type of health care fraud involved and its direct connection with the charged death, we conclude any claimed error in the § 1347(a) charge was harmless. In some cases the § 1347(a) health care fraudulent conduct may be far too attenuated from the fact of the patient's death to impose liability on the defendant. <u>See</u> <u>Houston</u>, 406 F.3d at 1124 n.5. That is not the case here.

## IV. INEFFECTIVE ASSISTANCE

### A. Ineffective Assistance Principles

---

death of another arising out of the distribution of drugs."), <u>overruled on other grounds by</u> <u>United States v. Leachman</u>, 309 F.3d 377, 385 n.9 (6th Cir. 2002). <u>Martinez</u> does not mention <u>Rebmann</u> or discuss the other circuits' decisions dealing with the similar enhanced penalty under § 841.

Webb also claims that his trial counsel's performance was deficient in that trial counsel failed to make appropriate motions for acquittal at the close of evidence. He argues that the evidence was insufficient to sustain his convictions, and that the motions for acquittal would have been granted. We review Webb's insufficiency of the evidence claim but through the lens of his ineffective assistance claim.[18]

In order to prevail on an ineffective assistance claim, a defendant must demonstrate both that (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). We may consider the prongs of the Strickland test in either order, and the defendant must show that both prongs are satisfied in order to demonstrate a Sixth Amendment violation. See Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000) ("[T]he court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa."(citation omitted)).

Given the overwhelming evidence outlined in detail above, we conclude that the government presented sufficient evidence to sustain all of Webb's convictions

---

[18]Because the record is adequately developed by virtue of the trial transcript, we review Webb's ineffective assistance claim in this direct appeal. See United States v. Patterson, 595 F.3d 1324, 1328 (11th Cir. 2010).

and that motions for acquittal, even if made, would have failed.[19]  Accordingly, we need not reach the performance prong, as, in any event, Webb suffered no prejudice from his counsel's performance in not making motions for acquittal at the close of the evidence.

## V. CONCLUSION

For all of these reasons, we affirm Webb's convictions and sentences.

**AFFIRMED.**

---

[19]"The evidence is sufficient to support a conviction if, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>United States v. Klopf</u>, 423 F.3d 1228, 1236 (11th Cir. 2005) (quotation marks omitted).  "In determining whether sufficient evidence supports a defendant's conviction, we view the evidence in the light most favorable to the government and draw all reasonable inferences and credibility choices in favor of the jury's verdict." <u>United States v. Chirinos</u>, 112 F.3d 1089, 1095 (11th Cir. 1997).

STAPLETON, Circuit Judge, concurring and dissenting:

With one exception, I concur in all of the conclusions reached by my colleagues. In particular, I agree that the enhanced penalties provided by 21 U.S.C. § 841(b)(1)(C) are to be imposed whenever, following an unlawful distribution of a controlled substance, the use of that substance becomes a but/for cause of a death or serious injury without regard to whether the death or injury was reasonably foreseeable to the defendant. As all of the courts of appeals which have considered the issue have concluded, that is what the literal text of the statute indicates and that literal reading is entirely consistent with the context in which the statute is found. As my colleagues acknowledge,

> [W]e are [here] applying a statute dealing with a discrete problem, the distribution of controlled substances, products which Congress recognized will in some cases cause death or serious bodily injury. In short, Congress recognized that the risk is inherent in the product and thus it provided that persons who distribute it do so at their peril. It is obvious Congress intended in such a case that the 20-year mandatory minimum would apply if death or serious bodily injury resulted from the use of the substance without regard for common law proximate cause concepts.

*United States v. Robinson*, 167 F.3d 824, 831 (3d Cir. 1999) (footnote omitted).

Section 1347 of Title 18 of the United States Code, however, does not deal with a discrete problem arising from products involving an inherent risk of serious

48

injury or death.[1]  Rather, it provides an enhanced penalty for health care fraud if the fraudulent scheme of the defendant resulted in death or serious bodily injury. Section 1347 thus applies to a wide variety of economically motivated health care activities and focuses on the relationship between the defendant's conduct and the consequences thereof.  For this reason, I agree with the conclusion of the Sixth Circuit Court of Appeals in *United States v. Martinez*, 588 F.3d 301, 318-19 (6th Cir. 2009), "that proximate cause is the appropriate standard to apply in determining whether a health care fraud violation 'results in death.'"

The *Martinez* Court is the only court of appeals that has previously addressed the causal connection required by § 1347.  It correctly points out that this section is not unlike a number of other statutes which impose enhanced punishment when the conduct constituting the defendant's violation "results" in death or serious bodily injury, citing in particular the Civil Rights Act, 18 U.S.C. §§ 241, 242 and 245, and

---

[1]Section 1347(a) provides:

Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice –
    (1)  to defraud any health care benefit program; or
    (2)  to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,

in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.  If the violation results in serious bodily injury (as defined in section 1365 of this title), such person shall be fined under this title or imprisoned not more than 20 years, or both; and if the violation results in death, such person shall be fined under this title, or imprisoned for any term of years or for life, or both.

the Fair Housing Act, 42 U.S.C. § 3631(a).[2]  Based on its review of the case law, the

*Martinez* Court found it to be a generally applicable "fundamental principle of

criminal law" that a "person is held responsible for all consequences proximately

caused by his conduct."  *Id.* at 315 (quoting *United States v. Wiegand*, No. 93-1735,

1994 U.S. App. LEXIS 37209, at *7 (6th Cir. 1994)).  Moreover, the Court reasoned

that "when the Congress provided that [a violation] resulting in death may be

punished by life imprisonment, [a court] must consider it to have been fully

cognizant of the principles of legal causation."  *Id.* (quoting *United States v. Marler*,

756 F.2d 206, 216 (1st Cir. 1985)).

Nothing in the text or context of section 1347 or its legislative history

counsels against giving the concept of injury resulting from the statutory violation

its traditional scope, and I would do so.

Contrary to the Government's suggestion, I am unable to conclude that the

---

[2]The *Martinez* Court cited several cases from other circuits addressing analogous statutes. *See United States v. Marler*, 756 F.2d 206, 215-16 (1st Cir. 1985) (holding that 18 U.S.C. § 242's requirement for enhanced punishment is met when the defendant's willful violation of the civil rights statute is a "proximate cause" of the victim's death, and that proximate cause can be demonstrated where death was the "natural and foreseeable" result of the defendant's conduct); *United States v. Woodlee*, 136 F.3d 1399, 1405 (10th Cir. 1998) (holding that "the bodily injury element of the felony crime is justified if injury was a foreseeable result of the" defendant's violation of 18 U.S.C. § 245(b)); *United States v. Harris*, 701 F.2d 1095, 1101 (4th Cir 1983) (holding that the "if death results" language of 18 U.S.C. § 241 requires only that death is foreseeable and naturally results from violating the statute"); *United States v. Guillette*, 547 F.2d 743, 749 (2d Cir. 1976) (holding that life imprisonment may be imposed if death results from violations of 18 U.S.C. § 241 when the defendant's violation of that statute is a proximate cause of the victim's death).

District Court's erroneous charge was harmless beyond a reasonable doubt.

Accordingly, I would reverse Appellant's conviction on Count 37 and affirm on all other counts.