NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 19-2319

———————

UNITED STATES OF AMERICA

v.

EMMA SEMLER,

Appellant

———————

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal Action No. 2-17-cr-00120-001)
District Judge: Honorable Gene E.K. Pratter

———————

Argued on September 23, 2020

Before: AMBRO, PORTER and ROTH, <u>Circuit Judges</u>
(Opinion filed:  June 1, 2021)

Peter Goldberger               (**ARGUED**)
50 Rittenhouse Place
Ardmore, PA 19003

    Counsel for Appellant


Nancy Rue                      (**ARGUED**)
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106

    Counsel for Appellee

Scott Burris
Temple University
Beasley School of Law
1719 N. Broad Street
Philadelphia, PA 19122

Counsel for Amicus Appellants

_____

OPINION[*]

_____

ROTH, Circuit Judge

Emma Semler is an addict who bought and injected heroin with a fellow user, then failed to intervene as that user overdosed and died. She now appeals her conviction and sentence under the Controlled Substances Act for distribution of heroin resulting in death,[1] a charge that carries a mandatory minimum sentence of twenty years' imprisonment.[2] We hold that the definition of "distribute" under the Controlled Substances Act does not cover individuals who jointly and simultaneously acquire possession of a small amount of a controlled substance solely for their personal use. Because a reasonable jury could find that Semler and the decedent jointly acquired possession of the heroin in question for their personal use, we will vacate Semler's conviction and remand this case for a new trial so that the jury can be instructed on the correct legal standard.

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.
[1] No. 17-120 (Pratter, D.J.).
[2] *See* 21 U.S.C. § 841(b)(1)(C).

# I

This case centers on the purchase and injection of heroin and resulting overdose death of Jennifer Werstler.  The details of the transaction are relevant to our analysis and are recounted below.

## A. Factual Background

Semler and Werstler were both addicted to heroin.  They met in a rehabilitation center as teenagers.  On the evening in question, Werstler returned to Pennsylvania from Florida for a drug-related hearing and immediately began reaching out to her network in search of heroin.  She contacted Semler via Facebook Messenger, asking, "Can we go get some???"[3]  Semler responded that she knew of somewhere "close," but Werstler would need to provide access to a car.[4]  Werstler then asked Semler if she could "front" (advance) her $10 worth of heroin and provide a syringe and water bottle for injection, and Semler agreed.[5]

That evening, according to testimony from Semler's sister Sarah, Werstler picked up Semler and Sarah and drove them to a location in West Philadelphia, where they purchased heroin.  Sarah testified that she did not purchase the drugs from the dealer, but could not recall whether Semler or Werstler completed the purchase.  The group then drove to a KFC restaurant where they entered the women's restroom to inject the heroin.

---

[3] Appx. 1577.
[4] *See* Appx. 1577, 439–440.
[5] *See* Appx. 1578–81.

Sarah testified that Semler physically handed her and Werstler baggies of heroin, and all three used their own needles to inject the drug.

After injection, Werstler began showing signs of an overdose. Sarah and Semler attempted to revive Werstler by splashing cold water on her, then left the bathroom and called their mother for a ride home. They did not call 911 or alert anyone to Werstler's condition. A KFC employee later discovered Werstler unresponsive and called 911. EMTs were unsuccessful in attempting to revive Werstler and pronounced her dead soon after. An autopsy found that her death was caused by an adverse reaction to heroin.

## B. Procedural History

A grand jury in the Eastern District of Pennsylvania returned a two-count indictment charging Semler with 1) distribution of heroin resulting in death, and aiding and abetting, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), and 18 U.S.C. § 2; and 2) distribution of heroin resulting in death, within 1,000 feet of a playground, and aiding and abetting, in violation of 21 U.S.C. § 860(a) and 18 U.S.C. § 2.

At the conclusion of the government's evidence at trial, Semler moved for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure on the basis that the government had failed to prove that she distributed heroin to Werstler. The District Court denied her motion. It also denied Semler's request to instruct the jury on proximate causation in connection with the "resulting in death" element of 21 U.S.C. § 841(b)(1)(C) and denied her motion to instruct the jury that individuals who jointly and

4

simultaneously acquire possession of a controlled substance for their shared personal use can be guilty only of simple possession.[6]

After a seven-day trial, a jury found Semler guilty of both charged counts. The District Court sentenced Semler to 252 months' (21 years') imprisonment, one year greater than the 20-year mandatory minimum imposed by Count 2 (distribution resulting in death 1,000 feet from a playground), of which Count 1 is a lesser included offense.

Semler appealed. On appeal, she presents three arguments: That the District Court applied the incorrect legal standard in refusing to allow a joint possession/simultaneous acquisition/personal use instruction, that the evidence was insufficient to show that she distributed heroin to Werstler, and that the District Court erred in refusing to instruct the jury that it must find proximate cause in order to establish the aggravated offense of "distribution resulting in death" under 21 U.S.C. § 841(b)(1)(C). We address each argument in turn.

## II

Although we generally review a district court's jury instructions for abuse of discretion, when one party challenges a jury instruction on grounds of "statutory construction involving the interpretation and application of legal precepts," review is plenary.[7] In conducting plenary review, we consider whether the charge, taken as a

---

[6] *See United States v. Swiderski*, 548 F.2d 445, 450 (2d Cir. 1977).

[7] *United States v. McGill*, 964 F.2d 222, 235 (3d Cir. 1992) (citation omitted), *cert. denied*, 506 U.S. 1023 (1992); *see United States v. Stewart*, 185 F.3d 112, 124 (3d Cir. 1999) (finding that a district court's refusal to give a jury instruction on a defendant's theory of his defense is reviewed *de novo* where the defendant objects).

whole and in light of the evidence presented, fairly and adequately submitted the issues in

the case to the jury.[8]

## III

The Controlled Substances Act (CSA), 21 U.S.C. § 841, makes it unlawful for any

individual knowingly or intentionally to "manufacture, distribute, or dispense, or possess

with intent to manufacture, distribute, or dispense, a controlled substance."[9]  The

meaning of the terms involved here is critical.  We first look at "distribute."  The CSA

defines it as "to deliver,"[10] and defines "deliver" as "the actual, constructive, or attempted

*transfer* of a controlled substance . . . whether or not there exists an agency

relationship."[11]

That brings us to the proper interpretation of the term "transfer," which is not

defined in the CSA.  When words are not defined within a statute, we construe them "in

accordance with [their] ordinary or natural meaning."[12]  However, we "do not . . . do so

blindly."[13]  Rather, "statutory language must be read with reference to its statutory

context," and "may or may not extend to the outer limits of its definitional

possibilities."[14]  For example, we will not interpret a "word[] of general meaning" to

include a particular act where "consideration of the whole legislation, or of the

---

[8] *United States v. Schneider*, 14 F.3d 876, 878 (3d Cir. 1994) (citation omitted).
[9] 21 U.S.C. § 841(a)(1).
[10] 21 U.S.C. § 802(11).
[11] 21 U.S.C. § 802(8) (emphasis added).
[12] *Bonkowski v. Oberg Indus., Inc.*, 787 F.3d 190, 199–200 (3d Cir. 2015) (internal citations omitted).
[13] *Id*. at 199.
[14] *Id*. at 200 (citation omitted).

circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include [it].”[15]

The government proposes the broadest possible definition of “transfer”:  that is, that *any* physical handoff of drugs from one person to another, no matter the circumstances, is a felony distribution offense.[16]  Semler, on the other hand, offers an interpretation of “transfer” that centers on possession and control.  She argues that, when there has been a joint acquisition or purchase of a controlled substance by a group of users to share among themselves, there is no “transfer” between the members of the group.  For the reasons stated below, we conclude that this is the appropriate definition of “transfer” under the facts of this case.

Interpreting “transfer” as Semler suggests is consistent both with the term’s plain meaning and with our precedent.  This definition mirrors the definition of “distribute” in the Third Circuit’s Model Jury Instructions, which states that “[d]istribute . . . as used in the offenses charged, means . . . to deliver or to transfer . . . *possession or control of a controlled substance from one person to another*.”[17]  We have cited it favorably in at

---

[15] *Id.* at 199 (quoting *Holy Trinity Church v. United States*, 143 U.S. 457, 459 (1892)).
[16] Appellee’s Response Brief (“Resp. Br.”) 30 (“[A] physical transfer of a controlled substance from one person to another constitutes a delivery.”); *see* Dissenting Op. at 3–4.
[17] Third Circuit Model Criminal Jury Instruction 6.21.841-2 (emphasis added).

least two opinions.[18]  Indeed, we approved a comparable definition in *United States v. Figueroa*.[19]

Turning to a plain reading of the statute, we are not persuaded by the government's sweeping interpretation.[20]  While we agree that Congress intended "distribute" to be construed broadly in the context of the CSA, neither Section 841(a)(1) nor any other provision in the statute indicates that every instance of shared drug use

---

[18] *See United States v. Rowe*, 919 F.3d 752, 760 (3d Cir. 2019); *United States v. Husmann*, 765 F.3d 169, 173 (3d Cir. 2014).

[19] *See* 729 F.3d 267, 273–74 (3d Cir. 2013).  In *Figueroa*, we favorably cited a case from the First Circuit describing "distribution" as a "transfer of possession of a controlled substance." *Id*. (quoting *United States v. Cortes-Caban*, 691 F.3d 1, 18 (1st Cir. 2012)).  We then held that the defendant, a police officer whose offense involved planting controlled substances on individuals to facilitate false arrests, engaged in distribution.  Our holding in *Figueroa* is entirely consistent with our holding today, because there was no dispute that the planting of controlled substances involved the transfer of *possession* of the substances.  And though we noted in *Figueroa* that "courts have interpreted 'distribute' broadly in the context of § 841(a)," we did so only to make clear that Figueroa was not exempt from the statute merely because he was a police officer investigating drug offenses and not a traditional drug dealer.  *Id.* at 274.  Moreover, our interpretation of the drug distribution statute in *Figueroa* was "strictly limited to [cases] . . . where drug distribution constituted an active part of [a] civil rights violation."  *Id.* at 275.

[20] *See, e.g.*, *Weldon v. United States*, 840 F.3d 865, 866 (7th Cir. 2016).

must constitute a felony distribution.[21]  Such a construction is "hyperliteral,"[22] contrary to the ordinary usage of the terms "transfer" and "distribute," and leads to consequences that Congress cannot have intended.  As Judge Posner explained in a similar situation:

> Suppose you have lunch with a friend, order two hamburgers, and when your hamburgers are ready you pick them up at the food counter and bring them back to the table and he eats one and you eat the other.  It would be very odd to describe what you had done as 'distributing' the food to him. It is similarly odd to describe what [the codefendants] did as distribution.  They had agreed to get high together, they shared the expense, they all went together to the drug dealer, and they shared the drug that they bought from him.  It's true that only [one defendant] transferred the money for the drug to the dealer, but it was the pooled money that he was handing over, although his contribution to the pool had been slight.  It's true that having paid he carried the drug back to [the decedent's] car.  But it would have been absurd for all three to have gone up to the dealer and each pay him separately, and even more absurd for them to have carried the minute package, containing less than half a gram of powder, together to the car and from the car to [the decedent's] residence.[23]

---

[21] After oral argument, the government submitted a letter of supplemental authority under Federal Rule of Appellate Procedure 28(j). It cites 21 U.S.C. § 841(b)(4), which makes it a misdemeanor to "distribut[e] a small amount of mari[j]uana for no renumeration" and has been applied to situations involving "social sharing" of marijuana, to support its position that Congress must have intended the CSA generally to encompass all instances of shared drug use among friends. We disagree.  Neither § 841(b)(4) nor the cases applying it find that "social sharing" of drugs other than marijuana must constitute a felony distribution under § 841(a)(1), and some in fact suggest that "social sharing" is more like simple possession than distribution. *See*, *e.g.*, *United States v. Eddy*, 523 F.3d 1268, 1271 (10th Cir. 2008) ("[S]ocial sharing of marijuana among friends [] is punished in a manner similar to simple possession . . . suggesting that this activity is akin to simple possession and not a lesser degree of distribution"); *United States v. Outen*, 286 F.3d 622, 637 (2d Cir. 2002) ("[T]here is reason to consider . . . the sharing of small amounts of marijuana in social situations [] to be . . . more akin to simple possession than to provisions intended to cover traffickers.").

[22] Even the late Justice Scalia found "hyperliteral" construction to be "contrary to common sense," an appreciation of the use of language with which we agree.  *See RadLAX Gateway Hotel*, *LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

[23] *Weldon*, 840 F.3d at 866.

The government's definition invites these misfitting results. It is well-established that, in enacting the CSA, Congress "dr[ew] a sharp distinction between" drug trafficking and illicit personal use of drugs.[24] Congress's rationale in doing so was that drug trafficking tends to have the dangerous, unwanted effect of drawing additional participants into the web of drug abuse."[25] On the other hand, when drug addicts engage only in simple possession of drugs, the CSA "prescribes lesser penalties and emphasizes rehabilitation of the drug abuser."[26] And our precedent makes clear that possession of a controlled substance may be joint if multiple people "ha[ve] dominion and control of the narcotic drug" or "knowingly ha[ve] power to exercise dominion and control over the drug."[27] The government's approach melds this "sharp distinction" between distribution and simple possession, transforming virtually all plain possession that takes place in a social setting into "distribution." Under that interpretation, a group of addicts seeking only to buy drugs for their own personal use would be guilty of distribution unless they engaged in precisely the kind of behavior posed by Judge Posner—walking up to their dealer as a group and ensuring that each person maintained a hand on a minute package of drugs at all times. Similarly, the government's interpretation would transform into a "distributor" even a first-time drug buyer who is handed a bag of drugs during a transaction with a drug dealer, but who gets cold feet and hands them back to the dealer. That is not the statute's fair meaning.

---

[24] *United States v. Swiderski*, 548 F.2d 445, 449–50 (2d Cir. 1977).
[25] *Id.*
[26] *Id.*
[27] *United States v. Davis*, 461 F.2d 1026, 1035 (3d Cir. 1972).

Further, the effect of the government's construction could be extreme. The CSA was adopted to curb the deleterious societal effect of drug trafficking activity.[28] To apply it as the government suggests could mean that prosecutors may bring felony distribution charges against any person who shares a small quantity of drugs with a friend, even if the two friends buy the drugs together and use them only amongst themselves. The government would have us believe that if two drug addicts jointly and simultaneously purchase methamphetamine and return home to smoke it together, a "distribution" has occurred each time the addicts pass the pipe back and forth to each other. Such an interpretation diverts punishment from traffickers to addicts, who contribute to the drug trade only as end users and who already suffer disproportionally from its dangerous effects. Indeed, the threat of harsh penalties in any joint-use situation could jeopardize addicts' safety even more by deterring them from using together specifically so that one can intervene if another overdoses.[29] Moreover, given the prevalence of shared drug use, a too-broad construction of "transfer" risks arbitrary enforcement.

---

[28] *See, e.g., Neal v. United States*, 516 U.S. 284, 288 (1996) (describing federal drug laws as attempts by Congress to "combat the menace of drug trafficking"); *see also United States v. Cooper*, 966 F.2d 936, 944 (5th Cir. 1992) (quoting H.R. 5484, 99th Cong., 2d Sess., 132 Cong. Rec. S27161, 27161 (Sept. 30, 1986) (Sen. DeConcini)) ("[The Controlled Substances Act] sends the clear message to those who decide to make their living in the insidious business of drug trafficking that we are no longer going to tolerate their activities.").

[29] In response to arguments by Semler and her *amici* relating to addict safety, the government asserts that Semler's penalty was warranted to "sanction egregious conduct" and deter others from abandoning fellow users during an overdose. Response Br. 21 n.12. This argument is misplaced: while we acknowledge that Semler acted shamefully in abandoning Werstler while she overdosed, Semler's flight has no relation to her distribution charge. Nor does her flight justify an erroneous legal standard that would unfairly punish future defendants and make it more difficult for users at risk of overdose to receive help.

11

Although we are not persuaded by the government's all-encompassing interpretation of "distribute," we do not conclude that instances of "social sharing" can never constitute a distribution under § 841(a)(1). Certainly, there may be situations where a transfer of possession has occurred between users in a social setting. Consider a situation in which one user goes alone to purchase a quantity of a controlled substance for himself, then transfers some or all of that substance to another user in a social setting for that person to use alone or share with others. Such a situation is more likely to constitute a distribution than the one presented here, where individuals purchase drugs together to share only among themselves.

In this context, we decline to find that every physical divvying up of a small quantity of jointly purchased and shared drugs must constitute a distribution.

## IV

We next consider Semler's request for a jury instruction stating that two or more individuals who jointly and simultaneously acquired possession of a controlled substance for their shared personal use may be found guilty only of simple possession. This view was first articulated by the Second Circuit Court of Appeals in *United States v. Swiderski*. In *Swiderski*, the defendant arranged to buy cocaine from a government informant. He and his fiancée went together to pick up the cocaine, and when both were later arrested, the cocaine was found in the fiancée's purse.[30] The court vacated Swiderski's conviction for possession with intent to distribute, finding that "[w]here two individuals

---

[30] 548 F.2d at 448.

12

simultaneously and jointly acquire possession of a drug for their own use, intending only to share it together, their only crime is [] simple joint possession[.]"[31] *Swiderski's* holding was "limited to the passing of a drug between joint possessors who simultaneously acquired possession at the outset for their own use;"[32] it does not apply where an individual was in "sole possession" of the drugs and served as a "link in the chain" of distribution to a third person.[33]

Multiple state courts (including the New Jersey Supreme Court) have adopted *Swiderski*'s reasoning.[34] The Seventh Circuit Court of Appeals applied *Swiderski* in *Weldon v. United States*, as noted above.[35] There, the defendant traveled with his girlfriend and another passenger to buy heroin, got out of the car to complete the purchase, and gave the heroin to his girlfriend for safekeeping. Weldon's girlfriend then injected herself, Weldon, and the third passenger with heroin. The third passenger overdosed and died.[36] The girlfriend and Weldon were charged with distribution

---

[31] *Id*. at 450.

[32] *Id*. at 450–51.

[33] *Id.* at 451.

[34] *See, e.g. Walmsley v. State*, 131 N.E.3d 768, 773 (Ind. Ct. App. 2019) ("[W]hen two or more people jointly acquire possession of a drug for their own use, intending only to share it together, they do not 'deliver' the drug when they inject or hand the drug to the other person, since they acquired possession from the outset and did not intend to distribute the drug to a third person."); *State v. Morrison*, 902 A.2d 860, 870–71 (N.J. 2006) (applying *Swiderski* and observing that "[t]o accept the State's strained view would lead to the absurd result that an act of distribution between [two joint purchasers] depended solely on the fortuity of who first took in hand the drugs from the dealer," given that "as a practical matter only one could actually conduct the purchase for the two of them,"); *State v. Carithers*, 490 N.W.2d 620, 623 (Minn. 1992) ("Under the reasoning of *Swiderski*, neither defendant can be convicted of the predicate felony of furnishing or transferring or delivering heroin to a spouse who already has constructive possession . . ..").

[35] 840 F.3d 865 (7th Cir. 2016).

[36] *Id.* at 866.

resulting in death.[37]  Judge Posner, writing for the Seventh Circuit Court of Appeals,

vacated Weldon's conviction, finding that, in light of *Swiderski*, "the insistence of

Weldon's lawyer to his client 'umpteen times' that a defense to the charge of distribution

had a zero chance of success was constitutionally deficient."[38]  The court refused to hold

that Weldon necessarily distributed the heroin in question merely because he got out of

the car and made the purchase from the dealer, finding that such reasoning would lead to

the "absurd" result of requiring joint purchasers to simultaneously approach a dealer, pay

for their share of the purchase separately, and receive a divided portion of the drugs.[39]

The discussion of *Swiderski* in *Weldon* is *dictum* but its facts are analogous to the

circumstances here.  Nevertheless, the government asks us to disregard *Weldon* and

*Swiderski* and instead apply *United States v. Wright*,[40] in which the Ninth Circuit Court of

Appeals found that *Swiderski* did not control where the defendant took money from a

friend to purchase heroin, went to the purchase location to buy it alone, and returned to

the friend's home to use it together.[41]  Other courts of appeals have applied *Wright's*

reasoning to similar situations, finding that an individual who purchases drugs *alone* on

---

[37] *See id*.  The girlfriend was subsequently acquitted so that she was not a party to the appeal.
[38] *Id.* at 867.
[39] *Id*. at 866.
[40] 593 F.2d 105 (9th Cir. 1979).
[41] 593 F.2d. at 106.

behalf of friends before returning to use the purchased drugs with those friends could not be granted a joint possession/simultaneous acquisition/personal use charge.[42]

While we hesitate to apply such an instruction outside of narrow circumstances evincing actual joint and simultaneous possession of a controlled substance, we think that a fact finder could determine that such circumstances are present here. This is not a situation, like *Wright*, where one individual solely purchased a drug. Instead, Semler and Werstler planned *together* to purchase drugs; traveled *together* to buy the drugs; and shared the drugs *together* for their own personal use.[43] Therefore, we will order a new trial in which the jury can be provided a joint possession/simultaneous acquisition/personal use instruction.

We conclude with a note on the modesty of our approach: we do not rule that Semler is not guilty of distribution, or that she and Werstler were joint purchasers of the heroin that caused Werstler's overdose. We leave those questions of fact to a properly

---

[42] *See United States v. Mancuso*, 718 F.3d 780, 798 (9th Cir. 2013) (following *Wright*, declining to apply *Swiderski* charge to cocaine dealer who sometimes used drugs with others when purported joint users did not "pool[] money with Mancuso and travel[] with him to acquire the cocaine jointly"); *United States v. Washington*, 41 F.3d 917, 920 (4th Cir. 1994) (adopting *Wright's* reasoning where individual bought cocaine alone with money provided by friends for their eventual shared use); *United States v. Speer*, 30 F.3d 605, 609 (5th Cir. 1994) (finding facts closer to *Wright* than *Swiderski* where one person with whom purchased drugs were intended to be shared was not "at or near the scene of the transaction").

[43] Courts have considered similar factors in determining whether a joint possession instruction is warranted. *See, e.g.*, *Commonwealth v. Carrillo*, 483 Mass. 269, 292 (2019) (quoting *Commonwealth v. Blevins*, 56 Mass. App. Ct. 206, 209 (2002)) ("[T]hat the defendant and his two companions were friends who on occasion shared drugs; that the three had pooled their money to purchase drugs they intended to share; that they each participated in the negotiation for the purchase of drugs; and that all were present when the drugs were paid for and received – was, if believed, sufficient to support a finding that the drugs were simultaneously and jointly acquired and intended to be shared only by the three purchasers."); *Weldon*, 840 F.3d at 866.

instructed jury on remand, which may well convict Semler. Under our holding today, Semler simply gets the opportunity to make her case on remand.

## V

Semler also requests that her conviction be reversed because evidence before the District Court was insufficient to support a finding that she distributed heroin to Werstler. As discussed above, the question of whether Semler's conduct rose to the level of a distribution rather than a joint purchase depends on the facts found by a properly instructed jury, an issue to be resolved on remand.

## VI

Also before us is Semler's request for a new trial on the basis that the District Court wrongly instructed the jury on the level of causation required to establish the aggravated offense of distribution in which "death . . . results" under 21 U.S.C. 841(b)(1)(C).[44]

The District Court instructed the jury that in order to find that Semler distributed heroin resulting in death, it must find beyond a reasonable doubt that Werstler's death would not have occurred but for the use of the heroin in question. The court did not, however, instruct the jury that it must find that Werstler's death was foreseeable. Semler unsuccessfully requested the following supplemental instruction:

> The conduct of the defendant is not the proximate cause of an individual's harm or death by a controlled substance distributed by [the] defendant as a matter of law where the injured or deceased individual is aware of the existence of a potential danger created by the defendant and as a result of the individual's own independent

---

[44] 21 U.S.C. § 841(b)(1)(C) (imposing 20-year mandatory minimum sentence when "death or serious bodily injury results" from use of a distributed controlled substance).

16

act brings about his own harm or death, because the condition created by the defendant was merely a circumstance of the accident and not its proximate cause.[45]

She now argues that "the court below wrongly refused to instruct the jury that proximate cause is an essential aspect of what it means for a death to 'result' from criminal conduct under the charged statutes, and to explain for the jury the meaning of 'proximate [cause]' in this context."[46]

We first address the government's claim that Semler failed to preserve her present objection to the instruction at issue. If a party has not timely objected to a jury instruction, we review any challenge to that instruction for plain error.[47] The government claims that because Semler's requested supplemental instruction at trial related to the effect of Werstler's independent acts on proximate cause rather than to the requirement of proximate cause itself, she waived any argument relating to a proximate cause requirement on appeal. We agree that Semler's proposed instruction does not explicitly state the proximate cause requirement which she advocates on appeal. But Semler's proposed instruction is not the only basis for preserving her claim. To preserve an objection to a jury instruction, a party is required to "inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate."[48] The record shows that Semler's trial counsel did so by repeatedly requesting a "proximate cause instruction" in relation to § 841(b)(1)(C) and objecting to the District Court's but-

---

[45] Appx. 136.
[46] Appellant's Opening Brief 37.
[47] Fed. R. Crim. P. 30(d), 52(b); *see United States v. Benchivigo*, 749 F.3d 205, 213 (3d. Cir. 2014).
[48] Fed. R. Crim. P. 30(d).

17

for causation instruction.[49]  In any event, Semler's proposed supplemental instruction directly challenges the District Court's conclusion that foreseeability is not required under § 841(b)(1)(C).  Therefore, her objection is preserved.

However, an instruction that § 841(b)(1)(C) requires proximate causation is not warranted under the law.  As Semler admitted in her motion to supplement the District Court's jury instructions at trial, we rejected the possibility of an § 841(b)(1)(C) proximate cause requirement in *United States v. Robinson*,[50] in which we reasoned that "it cannot have been the intent of Congress to require [proximate cause] as a condition of [the] mandatory minimum sentence being applicable under section 841(b)(1)(C) [because it] would limit the applicability of the section significantly and frustrate Congress' intent."[51]  Rather, under *Robinson*, but-for causation is all that is required.[52]

Recognizing that our precedent is not on her side, Semler points us to the Supreme Court's decision in *Burrage v. United States*,[53] which she claims held open the question

---

[49] *See* Appx. 1161 (Wescott, Semler's trial counsel: "I'm also going to submit a proposal for a proximate cause instruction.  I know you'll deny it because you denied my motion, but in order to preserve the package on that issue, that's why I'm doing it."); 1172 (Wescott: "If we've got supplemental instructions at the close of the case, I can think of two I might have . . . I just told you about the proximate cause."); Appx. 1247 (The Court: "With respect to your persisting on the proximate cause, I am denying that request for the very same reasons that I addressed at pretrial."  Wescott: "Note my objection, but I understand.").

[50] 167 F.3d 824 (3d Cir. 1999).

[51] *Id.* at 832.

[52] *Id.*  Other courts of appeals have also held that proximate causation is not required to establish an offense under Section 841(b)(1)(C) and comparable sections.  *See United States v. Harden*, 893 F.3d 434, 449 (7th Cir. 2018); *United States v. Burkholder*, 816 F.3d 607, 617 (10th Cir. 2016); *United States v. Webb*, 655 F.3d 1238, 1250 (11th Cir. 2011); *United States v. De La Cruz*, 514 F.3d 121, 137 (1st Cir. 2008); *United States v. Houston*, 406 F.3d 1121, 1123–24 (9th Cir. 2005);  *United States v. McIntosh*, 236 F.3d 968, 972 (8th Cir. 2001); *United States v. Patterson*, 38 F.3d 139, 145 (4th Cir. 1994).

[53] 571 U.S. 204 (2014).

18

of whether a proximate cause instruction is needed in light of the context and purpose of § 841(b)(1)(C). That reading misses the mark. *Burrage* held that Section 841(b)(1) "imports but-for causality."[54] That case did not disturb our precedent in *Robinson* because it did not reach the question of whether Section 841(b)(1)(C) also requires a showing of proximate causation.[55]

Here, record evidence showed that Jennifer Werstler had other drugs in her system at the time of her death—namely, alprazolam (commonly known as Xanax) and caffeine—but that her death was due to an adverse reaction to heroin. Armed with this information, the jury was instructed that, in order to find that death resulted from the use of a substance, it must find beyond a reasonable doubt that "the death would not have resulted had the victim not used the controlled substance distributed by Emma Semler."[56] This instruction falls squarely within the mandate laid out in *Burrage* and *Robinson*, and we will not disturb it on appeal. There was no reason to instruct the jury on proximate causation in its determination whether the use of the heroin with Semler resulted in Werstler's death. The District Court correctly refused to give a proximate cause instruction.

**VII**

---

[54] *Id.* at 216.
[55] Nor did any of the other cases cited in Semler's briefs abrogate our precedent in *Robinson*.
[56] Appx. 1427.

19

For the foregoing reasons, we will vacate the District Court's judgments of conviction and sentence and remand this case for further proceedings consistent with this opinion.

PORTER, *Circuit Judge*, concurring in part and dissenting in part.

The Controlled Substances Act prohibits the distribution of certain drugs. In that statute, Congress carefully defined the meaning of "distribute." Dissatisfied with the breadth of Congress's handiwork, the majority vacates Emma Semler's judgment of conviction. It holds that Semler did not "actually transfer" heroin when she handed it to Jennifer Werstler. Because that "is flatly contrary to standard English usage" and contradicts our Court's precedent, I respectfully dissent. *Kansas v. Garcia*, 140 S. Ct. 791, 802 (2020).

## I

As she had done numerous times before, Semler arranged to buy heroin for herself, her sister Sarah, and Werstler. She contacted the dealer, bought the heroin, and fronted the money for Werstler's portion. She gave Werstler a water bottle and syringe to mix and inject the heroin. The trio entered a KFC bathroom that Semler and Sarah had previously used to get high. Semler then handed the heroin to Werstler, who injected it. Moments later, when Semler and Sarah saw that Werstler had overdosed, they fled the KFC without telling anyone. Werstler died from the overdose.

A jury convicted Semler of distributing heroin in violation of 21 U.S.C. § 841(a)(1). Because Semler's distribution of heroin resulted in Werstler's death, she faced a twenty-year mandatory-minimum sentence and a maximum sentence of life in prison. *See* 21 U.S.C. §§ 841(b)(1)(C), 860(a). The District Court sentenced her to 252 months' imprisonment.

The question before us is whether the evidence at trial was sufficient to support Semler's conviction for distributing a controlled substance causing death. The majority says no, because Semler didn't "distribute" the heroin when she gave it to Werstler.

II

A

When interpreting a statute, "[w]e begin, as always, with the text." *Esquivel-Quintana v. Sessions*, 137 S. Ct. 1562, 1568 (2017). "Our first step . . . is to determine whether the language at issue has a plain and unambiguous meaning" that resolves "the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). When "the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917)).

To determine whether statutory language is unambiguous, we look at its "ordinary meaning . . . at the time Congress enacted the statute." *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) (internal quotation marks omitted) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). A statute is ambiguous only when it is "reasonably susceptible of different interpretations." *Dobrek v. Phelan*, 419 F.3d 259, 264 (3d Cir. 2005) (internal quotation marks omitted) (quoting *Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry.*, 470 U.S. 451, 473 n.27 (1985)). If particular words are ambiguous, "we look next at the surrounding words and provisions and also to the words in context." *Id.* We do not confine our analysis to one word or provision in isolation. "The meaning—or ambiguity—of certain words or phrases may only become

2

evident when placed in context." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000).

We must follow Congress's definitions. *Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 776 (2018). Under the Controlled Substances Act, it is unlawful to "knowingly or intentionally . . . distribute . . . a controlled substance." 21 U.S.C. § 841(a). To "'distribute' means to deliver (other than by administering or dispensing)." *Id.* § 802(11). And "'deliver' or 'delivery' mean[s] the actual, constructive, or attempted transfer of a controlled substance . . . whether or not there exists an agency relationship." *Id.* § 802(8). Congress's increasingly precise definitions ("distribute" = "deliver" = "actual transfer") easily resolve this case.

The meaning of "transfer" is plain, so Congress did not define that word. Instead, Congress used "transfer" to further define the "distribution" and "delivery" of controlled substances. We have noted that if a word is not defined within the statute, "dictionary definitions may be helpful." *Bonkowski v. Oberg Indus., Inc.*, 787 F.3d 190, 199 (3d Cir. 2015). So, although "transfer" is unambiguous, because the majority insists that it is subject to a range of interpretation, we should consult the dictionaries.

When Congress enacted the Controlled Substances Act in 1971, "transfer" meant what it means today: giving something to another. *See Transfer, Black's Law Dictionary* 1669 (4th ed. 1968) ("[t]o convey or remove from one place, person, etc., to another," or to "pass or hand over from one to another"); 2 *The Compact Edition of the Oxford English Dictionary* 3379 (12th prtg. 1976) (1971) ("[t]o convey or take from one place, person, etc. to another; to transmit, transport; to give or hand over from one to another");

3

*The Random House Dictionary of the English Language* 1504 (1973) ("To convey or remove from one place, person, etc., to another: *He transferred the package from one hand to the other*."); *Webster's New International Dictionary* 2689 (2d ed. 1950) ("[t]o convey from one person, place, or thing, to another; to transport, remove, or cause to pass, to another place, person, or thing"); *Webster's Third New International Dictionary* 2426–27 (1993) ("to carry or take from one person or place to another" or "to cause to pass from one person or thing to another").

The meaning of the word "actual" is also plain: "existing in fact or reality." *Webster's Seventh New Collegiate Dictionary* 10 (1967); *see also American Heritage Dictionary* 14 (1973) ("[i]n existence; real; factual"). To the extent "actual" or "transfer" are ambiguous on their own, the words in combination resolve that ambiguity. *See Brown & Williamson Tobacco Corp.*, 529 U.S. at 132; *Dobrek*, 419 F.3d at 264. Dictionaries are hardly necessary to confirm the obvious: "The plain, ordinary meaning of the words 'actual transfer' connotes the passing of an object from one person to another." *United States v. Santistevan*, 39 F.3d 250, 257 (10th Cir. 1994).

The majority admits that Congress intended "distribute" to be construed broadly in the context of the Controlled Substances Act. Indeed, Congress confirmed the breadth of "distribute," "deliver," and "transfer" by carving out specific exceptions. *United States v. Figueroa*, 729 F.3d 267, 274 (3d Cir. 2013). For example, the statute authorizes "[p]ersons registered by the Attorney General" to distribute controlled substances in conducting research. 21 U.S.C. § 822(b). And law enforcement officers are exempt so long as they are "lawfully engaged in the enforcement of [the Controlled Substances

4

Act]." *Id.* § 885(d). These exceptions are necessary because otherwise researchers and law enforcement officers might fall within the statute by transferring controlled substances in the course of their work. The explicit exceptions "support[] the application of § 841(a) to conduct outside those exceptions." *Figueroa*, 729 F.3d at 274.

More pointedly, Congress has already addressed the majority's concerns about a person delivering a "small amount of a controlled substance" for "shared personal use." Maj. Op. 12, 15, 16. Section 841(b)(4) provides that "any person who violates subsection (a) of this section by distributing a small amount of marihuana for no remuneration shall be treated as provided in section 844 of this title and section 3607 of title 18." 21 U.S.C. § 841(b)(4). That is, the person is punished as though he were guilty of simple possession. Two things are striking about this narrow carve-out for a small amount of shared marijuana compared to the majority's approach. First, Congress says that what we have called "social sharing of marijuana among friends" is, nevertheless, "distribution." *Catwell v. Att'y Gen.*, 623 F.3d 199, 209 (3d Cir. 2010) (internal quotation marks omitted) (quoting *United States v. Eddy*, 523 F.3d 1268, 1271 (10th Cir. 2008)), *abrogated on other grounds*, *Tineo v. Att'y Gen.*, 937 F.3d 200, 2010 (3d Cir. 2019). Such gratuitous distribution is punished *as though* it were simple possession, but the exception does not somehow convert "social sharing" into something other than distribution. *See Wilson v. Ashcroft*, 350 F.3d 377, 380 n.2 (3d Cir. 2003) ("We do not read section 841(b)(4) to literally convert gratuitous distribution of marijuana into 'simple possession' as the term is used in INA section 1182(h). Rather, subsection (b)(4) says that such small time distributors shall be 'treated as provided' in section 844.") The

5

majority, however, obliterates Congress's careful distinction by holding that social sharing of controlled substances *is not distribution*. *See* Maj. Op. 10, 15–16. Second, Congress's narrow carve-out applies only to one who gratuitously distributes a small amount of marijuana. The majority's boundless exception, however, can apply to one who distributes an undefined amount of *any* controlled substance, including, as here, a fatal dose of heroin—so long as the distribution occurred in an undefined "social setting." Maj. Op. 10, 12. In contrast to Congress's surgical exception for specific instances of marijuana distribution, the majority's approach blows a hole in the statute.

B

The majority finds the statute overly broad and Congress's exceptions insufficient. It doesn't reach that conclusion through textual analysis, but primarily on the basis of unpersuasive policy reasons.

Specifically, the majority says Congress's definition could yield "extreme" and "harsh" results. Maj. Op. 11. And, the majority speculates, it could jeopardize addicts' safety by discouraging them from engaging in shared drug use. That, allegedly, is preferable because "one [user] can intervene if another overdoses." Maj. Op. 11–12. But criminalizing the physical transfer of potentially lethal drugs like heroin is not self-evidently "extreme" or "harsh." Those are subjective and value-laden adjectives, not legal judgments. Our role "is to apply the statute as it is written—even if we think some other approach might 'accor[d] with good policy.'" *Burrage v. United States*, 571 U.S. 204, 218 (2014) (alteration in original) (quoting *Comm'r v. Lundy*, 516 U.S. 235, 252 (1996)).

6

The majority's policy concerns are not only contestable, they are irrelevant. "[P]olicy considerations cannot create an ambiguity when the words on the page are clear." *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1358 (2018). Even when there is ambiguity, context—not policy—resolves it. *See Dobrek*, 419 F.3d at 263–64. Here, the majority's policy musings in favor of shared drug use find no support in the words or context of § 841.

C

Troubled by the statute's breadth, the majority provides its own limiting language. The statute defines "distribute" as the "deliver[y]" of "a *controlled substance*," and "delivery" as the "transfer of a *controlled substance*." 21 U.S.C. § 802(8), (11) (emphases added). According to Congress, the object of prohibited distribution, delivery, or transfer is the controlled substance itself. But the majority emends the statutory definitions so that the object is not the actual controlled substance, but "possession and control" of the substance. Maj. Op. 7. Shifting the focus from a physical thing (heroin) to an abstract legal concept (joint possession) enables the majority to then create a brand-new statutory exception for "shared personal use" facilitated through "joint possession." Maj. Op. 13, 15–16.

Section 841 punishes the distribution of physical drugs, not legal abstractions. Punishing the distribution of *drugs* rather than modes of *possession* makes sense. Drug dealers and addicts, often operating in the shadows and through intermediaries, are likely to create all manner of convoluted fact patterns raising knotty questions affecting title and possession. So it is perfectly rational that Congress focused on the conduct that it wanted

7

to stop—the distribution of *controlled substances*. The majority's alternative rendering ignores this statutory context and mangles ordinary English usage. Nobody would ever refer to the distribution of "possession or control" of illegal drugs, as the majority posits. Congress used "transfer" to further define the prohibited distribution of illegal drugs. So when considering charges under the Controlled Substances Act, we simply refer to distributing, delivering, or transferring the drugs themselves.

The majority declares this interpretation of the statute is "hyperliteral" and the "broadest possible definition," though it makes no attempt to justify those characterizations. Maj. Op. 9. The charge is unfounded. Saying that Semler "actually transferred" heroin to Werstler when she physically handed heroin to Werstler is a natural formulation of the English language and consistent with Congress's usage in § 841.

It is easy enough to imagine truly hyperliteral constructions of "actual transfer." For example, one might argue that a person who carries heroin from his car to his house has literally "transferred" the heroin under the dictionary definitions. But he has not "transferred," "delivered," or "distributed" the heroin under the statute's meaning. Among other contextual clues, the statutory definition of "deliver" discusses "agency relationship[s]," so it implies person-to-person transfers. 21 U.S.C. § 802(8). So do the statutory exceptions for authorized researchers and law enforcement officers. 21 U.S.C. §§ 822(b), 885(d). Again, context is our guide. We "adher[e] to the *fair meaning* of the text," not the "hyperliteral meaning of each word in the text." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 356 (2012). Semler's giving heroin to Werstler easily fits within the meaning of "transfer" in § 802.

D

The majority does not define "transfer." Instead, it cites Semler's brief for an interpretation of "distribute" that carves out an exception for the facts of this case. *See* Maj. Op. 8 & n.35 (citing Appellant's Br. 19–20). The majority then concludes that Semler's interpretation of "distribute" "is the appropriate definition of 'transfer' under the facts of this case." Maj. Op. 7–8. The majority's approach is circular. Section 802 defines distribution as an "actual, constructive, or attempted transfer," but the majority inverts Congress's definition. By defining "transfer" with its preferred interpretation of "distribute," the majority avoids the plain meaning of "transfer."

Semler's definition is also circular. Semler defines "transfer" as the "transfer [of] possession of the substance from one person to another." Reply Br. 3. Because Semler's definition is self-referential, it is a mere tautology with no analytical power. Defining a "transfer" of controlled substances as a "transfer" of possession or control sheds no light on the meaning of "transfer." It simply replaces the object of §§ 802(8), 802(11), and 841 with Semler's preferred object, while the verb remains exactly the same.

The majority claims that Semler's definition of "transfer" mirrors a definition of "distribute" in the Third Circuit Model Criminal Jury Instructions. Maj. Op. 8. Here is the full model definition: "Distribute (to distribute), as used in the offenses charged, means (deliver or transfer) (to deliver or to transfer) possession or control of a controlled substance from one person to another." Third Circuit Model Criminal Jury Instructions § 6.21.841-5 (2018). This is merely an alternative definition of "distribute," which the Controlled Substances Act already defines. *See* 21 U.S.C. § 802(11). When a statute

9

provides a definition, it is its own dictionary and we must follow *that* definition. *Digital Realty Tr.*, 138 S. Ct. at 776. There is no need to rummage around in the Model Jury Instructions or elsewhere looking for another definition of "distribute" that we prefer to Congress's. In any event, Congress employed the word "transfer" as a way to further refine its definitions of "distribute" and "deliver." 21 U.S.C. § 802(8), (11). So the majority's invocation of a non-statutory definition of "distribute" as a potential clue to the meaning of "transfer" is backwards and confusing, not clarifying.

Congress did not include the phrase "of possession or control" in its definitions of "distribute" or "delivery." 21 U.S.C. § 802(8), (11).[1] "Conspicuously, the operative term 'transfer' is nowhere qualified or limited, by the phrase 'of possession' or otherwise." *United States v. Brunty*, 701 F.2d 1375, 1380 (11th Cir. 1983). And the Model Jury Instructions do not define "transfer." Neither does the statute. In this situation, we typically "look to dictionary definitions to determine the ordinary meaning of a word." *United States v. Husmann*, 765 F.3d 169, 173 (3d Cir. 2014). But the majority avoids

---

[1] If Congress had wanted to use the majority's preferred "transfer of possession or control" language, it knew how to do so. Congress has used that exact phrase in other statutes. For example, the Atomic Energy Act of 1954 permits the Atomic Energy Commission to regulate nuclear facilities. If the Commission requires, nuclear facilities "shall not *transfer possession or control* of [nuclear equipment or material] except pursuant to a license issued by the Commission." 42 U.S.C. § 2021(c)(4) (emphasis added). Congress also used the phrase in The Merchant Marine Act of 1936: "The Secretary [of Transportation] may *transfer the possession or control* of a vessel acquired under this chapter to another department or agency of the United States Government on terms and conditions approved by the President." 46 U.S.C. § 56306(b) (emphasis added). If the majority thinks that the word "transfer" in 21 U.S.C. § 802(8) should carry with it the concept of "possession or control," it must explain why Congress chose not to include that phrase in the text.

dictionaries—and in fact cites no authority whatsoever—for any definition of "transfer." The majority appears to have created its alternative definition of "transfer" entirely on its own, perhaps with inspiration from Semler's briefs. *See* Maj. Op. 7 & n.34, 8 & n.35. Either way, nothing about it implies an exception for joint possession.

The majority cites two cases to justify its approach. It claims that both cases use its proffered definition of "distribute" from the Model Jury Instructions. That is incorrect. In fact, both cases undermine the majority's position.

In *United States v. Rowe*, 919 F.3d 752 (3d Cir. 2019), we cited a different rule from the Model Jury Instructions than the rule the majority cites here. *Compare id.* at 760 (citing § 6.21.841-5), *with* Maj. Op. 8 n.36 (citing § 6.21.841-2). We cited a different rule because we were interpreting a different crime: *possession with intent* to distribute a controlled substance. *Rowe*, 919 F.3d at 760. We distinguished that crime from distribution (at issue here), because "[u]nlike distribution, possession with intent to distribute is a continuing offense." *Id.* That matters, because the intent to distribute ends at the "relinquishment of both actual and constructive possession" of the controlled substance. *Id.* (internal quotation marks omitted) (quoting *United States v. Benjamin*, 711 F.3d 371, 378 (3d Cir. 2013)). Simply put, *possession* with intent to distribute is all about *possession*. Distribution merely requires a transfer of the substance itself—actual or constructive. *See* 21 U.S.C. § 802(8). *Rowe* actually supports a plain-meaning interpretation of "distribution" of controlled substances, not the majority's contrived interpretation.

11

The majority's second case is equally unavailing. In *United States v. Husmann*, 765 F.3d 169 (3d Cir. 2014), we were interpreting the meaning of "distribute" in the context of a child-pornography statute. *Id.* at 173 (applying 18 U.S.C. § 2252). Because the statute did not define "distribute," we looked to other sources, starting with dictionaries. *Id.* at 173–74. One of those sources was the Model Jury Instructions. *Id.* Here, however, Congress has defined "distribute" in the statute, so we need not search for alternative definitions. *See Digital Realty Tr.*, 138 S. Ct. at 776. And because Congress defined "distribute" as an "actual . . . transfer," but did not define "transfer," we cannot determine the meaning of "transfer" by looking to definitions of "distribute." *See Husmann*, 765 F.3d at 173. Even so, we concluded in *Husmann* that "distribution necessarily involves the transfer of materials to another person." *Id.* at 174. Our cases repeatedly confirm that "distribution occurs when [illicit] materials are actually transferred." *Id. Husmann*, too, supports a plain-meaning interpretation of "distribution."

E

The majority offers no textual explanation for its choice. It merely supplements Congress's definition with new language and then asserts that joint possessors cannot "actually transfer" a drug between themselves. Not so. Even accepting the majority's idiosyncratic definition of "transfer," nothing about it requires us to create a new exception for joint possession.

The majority seems to think that "possession" is the operative word in its alternative definition. The idea, apparently, is that the dealer somehow transferred possession jointly to Semler and Werstler when he sold the heroin to Semler, so Semler

12

could not then "transfer" possession by handing it to Werstler. That notion relies on an unproven and counterfactual assumption; there is no evidence in the record that Semler's dealer gave possession of the heroin bundle to anyone but Semler. Sarah's boyfriend testified that either he or Semler always served as the point of contact with the dealer, called ahead to arrange a meeting with the dealer, and made the exchange with the dealer. Neither Sarah nor Werstler were ever the point of contact with the dealer. Sarah's boyfriend was not present that day, so the jury obviously concluded that Semler was the only plausible purchaser. On the day of Werstler's death, we know that Semler provided the money, contacted the dealer, and handed the heroin to Sarah and Werstler in the bathroom. The majority does not point to anything in the record indicating that Werstler possessed the heroin before Semler gave it to her.

Perhaps the dealer transferred *constructive* possession to Werstler when Semler purchased the drugs? That is even less plausible. "Constructive possession requires 'the power and the intention at a given time to exercise dominion or control over a thing.'" *Rowe*, 919 F.3d at 760 (quoting *Benjamin*, 711 F.3d at 376). Again, nothing in the record supports the inference that Werstler "exercise[d] dominion and control" over the heroin. *Id.* She did not pay for, own, or control the heroin; Semler was the one who paid for, owned, controlled, and gave some of it to Werstler. "Dominion and control are not established . . . by 'mere proximity to the [item], or mere presence on the property where it is located or mere association with the person who does control the [item].'" *Benjamin*, 711 F.3d at 376 (second and third alterations in original) (quoting *United States v. Jenkins*, 90 F.3d 814, 818 (3d Cir. 1996)). Perhaps the majority believes that Werstler

13

constructively possessed the heroin because she and Semler rode in the car to meet Semler's dealer. But "[p]roof that a defendant associated with a person who controls a drug is insufficient to prove constructive possession." *Rowe*, 919 F.3d at 760.

In any event, the Controlled Substances Act punishes both constructive and actual transfers. The majority cites no authority for its bald assertion that, "when there has been a joint acquisition or purchase of a controlled substance by a group of users to share among themselves, there is no 'transfer' between the members of the group." Maj. Op. 7–8. Even accepting the false premise that Werstler constructively possessed the heroin, Semler still actually transferred the heroin to her. "Nothing . . . precludes a 'constructive' transfer simply because an 'actual' transfer has taken place." *Wedgewood Vill. Pharmacy v. DEA*, 509 F.3d 541, 551 (D.C. Cir. 2007). The inverse is also true. *See Brunty*, 701 F.2d at 1381. Whether Werstler may have constructively possessed the heroin at some point before Semler's handoff is irrelevant to the § 841(a) analysis.

F

The majority incorrectly invokes the absurdity doctrine as part of its analysis. *See* Maj. Op. 7–9, 14–15. We apply that doctrine only in "rare cases." *United States v. Fontaine*, 697 F.3d 221, 227 (3d Cir. 2012). The bar is high: "An absurd interpretation is one that 'defies rationality or renders the statute nonsensical and superfluous.'" *Riccio v. Sentry Credit, Inc.*, 954 F.3d 582, 588 (3d Cir. 2020) (en banc) (internal quotation marks omitted) (quoting *Encompass Ins. Co. v. Stone Mansion Rest. Inc.*, 902 F.3d 147, 152 (3d Cir. 2018)).

14

Semler's twenty-year mandatory-minimum sentence is not incoherent or unreasonable. That Congress sought to deter or harshly punish those who distribute deadly drugs may raise interesting policy questions, but it does not defy rationality. *See Cabeda v. Att'y Gen.*, 971 F.3d 165, 177 n.12 (3d Cir. 2020). And undesirable results are not enough to invoke the canon against absurdity. "As long as Congress could have any conceivable justification for a result—*even if the result carries negative consequences*—that result cannot be absurd." *Riccio*, 954 F.3d at 588 (emphasis added). We have said before that §§ 802(11) and 841 demonstrate "the strength of Congress' desire to penalize all those who in any way try to engage in drug distribution." *United States v. Everett*, 700 F.2d 900, 907 n.15 (3d Cir. 1983)). That should end the discussion, because this Court has already identified a "conceivable justification for [the] result." *Riccio*, 954 F.3d at 588.

## III

### A

Our Court has covered this ground before. Following the text's plain meaning, we have "broadly construed the term, 'distribute,' as encompassing any acts 'perpetrated in furtherance of a transfer or sale.'" *United States v. Pungitore*, 910 F.2d 1084, 1133 (3d Cir. 1990) (quoting *Brunty*, 701 F.2d at 1381). Accordingly, in *United States v. Figueroa*, 729 F.3d 267 (3d Cir. 2013), we held that a police officer had distributed a controlled substance when he planted drugs on a man he was arresting. *Id.* at 274. Our reasoning was straightforward: "Under the plain language of the statute, a 'distribution' encompasses the *transfer of a controlled substance* from one person or place to another

15

and thus the planting of controlled substances on individuals to facilitate false arrests." *Id.* (emphasis added). Our holding in *Figueroa* compels the same conclusion here. Semler handed the heroin to Werstler and thus engaged in "the transfer of a controlled substance from one person . . . to another." *Id.*

The majority's cursory treatment of *Figueroa* in a footnote is unconvincing. The majority claims that *Figueroa* turned on "the transfer of *possession* of the substances." Maj. Op. 8 n.38. Once again, the majority relies on a word that is missing from the statute. We upheld the distribution conviction in *Figueroa* because the defendant police officer *physically planted drugs* on a man he was arresting. *Figueroa*, 729 F.3d at 274. The case shows that legal possession is irrelevant to Congress's definition.

Moreover, in *Figueroa* we explicitly adopted the First Circuit's interpretation of "distribute" in *United States v. Cortes–Caban*, 691 F.3d 1 (1st Cir. 2012). *See Figueroa*, 729 F.3d at 273–74. In *Cortes–Caban*, the court held that the defendants fell under § 802(11)'s definition of "distribute" by "transferring the drugs *amongst each other* and to the victims." *Cortes–Caban*, 691 F.3d at 18 (emphasis added). The court cited the same dictionary definitions that I employ to guide the plain-meaning interpretation. *See id.* at 17. We agreed with the First Circuit that "[u]nder the plain language of the statute, a 'distribution' encompasses the transfer of a controlled substance from one person or place to another." *Figueroa*, 729 F.3d at 274.

## B

In place of the plain text, the majority creates an amorphous fact-bound standard. The majority says that, on remand, the District Court must provide a "joint

16

possession/simultaneous acquisition/personal use instruction." Maj. Op. 5, 16. Whether those modifiers are non-dispositive factors or necessary elements is not clear. Further confusing matters, the majority says that its definition "is the appropriate definition of 'transfer' under the facts of this case." Maj. Op. 8. The majority thus implies that it could apply a different definition to a different set of facts. But the statute fixed the meaning of the words at the time it was enacted. *See Wis. Cent. Ltd.*, 138 S. Ct. at 2070. We apply that fixed legal standard to the particular facts of each case, not the other way around.

C

Finally, the majority embraces *United States v. Swiderski*, 548 F.2d 445 (2d Cir. 1977), in support of its joint-possession carve out. *Swiderski* is an extreme outlier and courts have accordingly given it little weight. The majority errs by relying on it.

First, the *Swiderski* court ignored the statute's plain meaning. Besides a brief quote of the statutory language, the court did not attempt to construe the meaning of an "actual, constructive, or attempted transfer." 21 U.S.C. § 802(8); *see Swiderski*, 548 F.2d at 449. Instead, it sought to divine the congressional intent behind the statute. *See Swiderski*, 548 F.2d at 449–50. Looking to advisory-committee notes, congressional reports, and "the statutory drug enforcement scheme as a whole," the court determined that joint purchase-and-use "does not pose any of the evils which Congress sought to deter." *Id.* Setting aside

17

the well-known difficulties of determining congressional intent apart from statutory text and context,[2] the *Swiderski* court's approach contradicts our law.

When interpreting a statute, we begin with the text. *Esquivel-Quintana*, 137 S. Ct. at 1568. The court in *Swiderski* ignored the "ordinary meaning" of the statutory language "at the time Congress enacted the statute." *Wis. Cent. Ltd.*, 138 S. Ct. at 2070 (internal quotation marks omitted) (quoting *Perrin*, 444 U.S. at 42). Indeed, the court did not consider *at all* "whether the language at issue has a plain and unambiguous meaning," which is the first step in statutory interpretation. *Robinson*, 519 U.S. at 340. After broadly discussing other sections in the statute, the court leaped straight into legislative history. *See Swiderski*, 548 F.2d at 449–50.

*Swiderski*'s faults are perhaps understandable given that the majority did not benefit from "the past three decades of Supreme Court statutory-interpretation caselaw." *Riccio*, 954 F.3d at 587. But we have benefited from post-*Swiderski* developments in statutory interpretation, so we should not resurrect questionable methodology and perpetuate an erroneous interpretation.

Unsurprisingly, the *Swiderski* court cited no cases supporting its idiosyncratic interpretation of the statute. Since then, other circuits have appropriately rejected invitations to follow *Swiderski*. *See, e.g.*, *United States v. Cormier*, 468 F.3d 63, 72 (1st Cir. 2006); *United States v. Washington*, 41 F.3d 917, 920 (4th Cir. 1994); *United States*

---

[2] *See generally* Antonin Scalia, *A Matter of Interpretation: Federal Courts and the Law* 29–37 (1997); John F. Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387, 2408–19 (2003).

*v. Speer*, 30 F.3d 605, 608–09 (5th Cir. 1994); *United States v. Wright*, 593 F.2d 105, 108 (9th Cir. 1979). Indeed, no court in the fifty years since enactment of the Controlled Substances Act has held that physically handing someone drugs is not distribution under the Act.[3] During that time, courts have stated the obvious, that "[s]haring drugs with another constitutes 'distribution' under § 841(a)(1)." *Washington*, 41 F.3d at 919. The only favorable authorities the majority can muster are state courts interpreting state law.

Even the Second Circuit has shunned *Swiderski*. In *United States v. Wallace*, 532 F.3d 126 (2d Cir. 2008), the appellant challenged his conviction for possession with intent to distribute cocaine base, arguing from *Swiderski* that he had the cocaine only to share with family and friends. *Id.* at 128. After surveying other circuit decisions rejecting *Swiderski*-based arguments in social-sharing cases, the court upheld the conviction:

> We now join this sound majority and hold that the sharing of drugs, without a sale, constitutes distribution for purposes of 21 U.S.C. § 841(a), which makes it illegal to "possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). The word "distribute" means "to deliver," *id.* § 802(11); and "deliver" means "the actual, constructive, or attempted transfer of a controlled substance," *id.* § 802(8). These definitions, which take no account of consideration, bespeak a congressional intent "to proscribe a range of conduct broader than the mere sale of narcotics." *Washington*, 41 F.3d at 919.

*Wallace*, 532 F.3d at 129.

---

[3] Even *Swiderski* did not go as far as the majority does today. The charge in *Swiderski* was possession with intent to distribute, not distribution itself. *See United States v. Swiderski*, 548 F.2d 445, 447 (2d Cir. 1977). The court held that intent to distribute cannot be inferred from joint purchasers and possessors of a controlled substance who intend to share it between themselves as users. *Id.* at 447, 452.

The Seventh Circuit's decision in *Weldon v. United States*, 840 F.3d 865 (7th Cir. 2016), is even less instructive. The defendant in *Weldon* argued in a 28 U.S.C. § 2255 motion that he was entitled to an evidentiary hearing on a claim of ineffective assistance of counsel. *Weldon v. United States*, No. 14-0691-DRH, 2015 WL 1806253, at *1 (S.D. Ill. Apr. 17, 2015), *vacated*, 840 F.3d 865 (7th Cir. 2016). Defense counsel had advised that "a defense to the charge of distribution had a zero chance of success." *Weldon*, 840 F.3d at 867. The Seventh Circuit observed that defense counsel could have made a *Swiderski*-type argument, so it ordered an evidentiary hearing on the ineffectiveness of counsel. *Id.*

The majority's assertion that the court in *Weldon* "refused to hold that [the defendant] necessarily distributed the heroin" is thus misleading. Maj. Op. 14. The court did not opine on that question because it *could not* go that far on a § 2255 motion. *See Weldon*, 840 F.3d at 867. *Weldon* also suffers from the same infirmities as *Swiderski* in that it did not analyze the text of the statute. *Id.* at 865–67. The court never even mentioned the statutory definitions of "distribute" and "deliver." *Id.*

Even if *Swiderski* were persuasive, it is factually distinguishable. In *Swiderski*, the defendant and his fiancée snorted cocaine at an informant's house. *Swiderski*, 548 F.2d at 448. After sampling the drugs, the defendant's fiancée told the informant that they might have a buyer. The defendant took the cocaine and put it in his pocket. The couple was arrested shortly after they left the informant. Upon arrest, Swiderski's fiancée had cocaine in her purse. The court vacated the charge for possession with intent to distribute because "both acquire[d] possession from the outset and neither intend[ed] to distribute

20

the drug to a third person." *Id.* at 450. "[N]either serve[d] as a link in the chain of distribution." *Id.* That is not true here. Semler had the relationship with the dealer, purchased the heroin, provided the water bottle to mix the heroin and the syringe to inject it, and gave the heroin to Werstler. From Werstler's perspective, Semler *was* the chain of distribution.

The majority attempts unpersuasively to explain away these distinguishing facts. First, it relies on the false premise that Werstler possessed the heroin the moment Semler purchased it. But even under the majority's preferred definition of "transfer," Werstler did not have "possession or control" over the heroin until Semler physically handed it to her. *See Benjamin*, 711 F.3d at 376; *Rowe*, 919 F.3d at 760. Second, the majority cryptically states that "[t]his is not a situation, like *Wright*, where one individual solely purchased a drug." Maj. Op. 15. But the majority ignores the undisputed fact that Semler alone paid for the heroin. Although Werstler suggested she would eventually repay Semler, the expense was not ultimately shared because Werstler died upon injecting the heroin that Semler bought and gave to her. In any event, § 841(a) is indifferent to the financial arrangements that drug dealers and addicts might negotiate with each other. *See United States v. Coady*, 809 F.2d 119, 124 (1st Cir. 1987) ("An exchange of money is not a required element of the offense."). It criminalizes the physical transfer of controlled substances, not just those transfers unencumbered by personal loans. Surely, the concept

21

that giving someone heroin constitutes distribution is not a novel interpretation of the statute.[4]

Finally, the joint purchasers in *Swiderski* were equally involved in the purchase. Here, Semler actively steered the drug transaction from beginning to end, and Werstler was not an equal participant. Many courts have distinguished *Swiderski* on these grounds. *See, e.g.*, *Wright*, 593 F.2d at 108; *Speer*, 30 F.3d at 608–09; *State v. Moore*, 529 N.W.2d 264, 266 (Iowa 1995); *Long v. United States*, 623 A.2d 1144, 1151 (D.C. 1993); *State v. Toppan*, 425 A.2d 1336, 1340 (Me. 1981). Indeed, Werstler's previous efforts to obtain heroin had all failed until she contacted Semler. Semler was certainly a "link in the chain of distribution" that allowed Werstler to obtain heroin that fateful day. *Swiderski*, 548 F.2d at 450.

---

[4] *See, e.g.*, *United States v. Moore*, 423 U.S. 122, 124 (1975) (physician prescribing controlled substance "outside the usual course of professional practice"); *United States v. Tighe*, 551 F.2d 18, 19 (3d Cir. 1977) (same); *United States v. Figueroa*, 729 F.3d 267, 274 (3d Cir. 2013) (police officer planting drugs); *United States v. Cortes-Caban*, 691 F.3d 1, 18 (1st Cir. 2012) (same); *United States v. Wallace*, 532 F.3d 126, 128–29 (2d Cir. 2008) (social sharing of drugs without a sale); *United States v. Washington*, 41 F.3d 917, 920 (4th Cir. 1994) (same); *United States v. Workopich*, 479 F.2d 1142, 1147 (5th Cir. 1973) (intermediary between a government informant and his connection); *United States v. Vincent*, 20 F.3d 229, 232–33 (6th Cir. 1994) (unpaid delivery to government informant); *United States v. Roya*, 574 F.2d 386, 393–94 (7th Cir. 1978) (physician prescribing controlled substances without examining patients or their medical history); *United States v. Fregoso*, 60 F.3d 1314, 1324 (8th Cir. 1995) (middleman putting co-defendant in touch with drug source and acting as "debt collector"); *United States v. Wright*, 593 F.2d 105, 108 (9th Cir. 1979) (social sharing between friends without a sale); *United States v. Mancuso*, 718 F.3d 780, 798 (9th Cir. 2013) (same); *United States v. Wigley*, 627 F.2d 224, 226 (10th Cir. 1980) (transporting drugs, vouching for their quality, and allowing further inspection); *United States v. Catchings*, 922 F.2d 777, 780 (11th Cir. 1991) (joint possessors physically passing drugs between themselves).

D

The majority seems to suggest that if someone transfers heroin to a "friend" and the friend injects it in a "social setting," then a "distribution" cannot have occurred. Maj. Op. 9 n.40, 11, 15–16. There is no textual or contextual basis for such an exception, and for good reason. How could courts and juries possibly weigh a "friendship" factor in the drug-distribution and drug-abuse context? This case starkly reveals how easily such an exception would erode Congress's firm determination to stop the distribution of dangerous drugs.

Semler's and Werstler's short-lived "friendship" began, revolved around, and tragically ended because of Semler's access to heroin. They met at the Malvern Institute for addiction treatment in November 2013. On several occasions thereafter, Semler and her boyfriend traveled to their drug dealer to obtain heroin for themselves and Werstler. Each time Semler provided heroin to Werstler. Werstler's mother knew who Semler was but met her just once. She did not consider Semler to be a "friend" to her daughter but someone who enabled Werstler's heroin addiction. On March 27, 2014, Werstler entered another drug rehabilitation center, this time in Florida. She returned to Pennsylvania on May 7 for a court hearing on May 8. On May 9, Werstler tried unsuccessfully to obtain heroin from other dealers, but scored after reaching out to Semler late that afternoon. A few hours later, Werstler lay dying as her "friend" stealthily left the scene.

Even if friendship were somehow relevant to the distribution analysis under § 841(a), a factfinder could reasonably conclude that Semler was Werstler's "source"

23

rather than her "friend." But the entire discussion is bootless because the statute simply doesn't hint of any exception for distribution to one's friends.

Finally, while simple possession is limited to § 844, the concept of distribution pervades the Controlled Substances Act. Semler was convicted under 21 U.S.C. §§ 860(a), 841(a)(1), and 841(b)(1)(C), all of which discuss distribution. Distribution also arises in the contexts of commercial labeling and packaging (§ 825), transportation safety offenses (§ 849), commercial licensing (§ 822), and online pharmacies (§ 831), just to name a few. All are governed by the same definition in § 802 that the majority rejects today.

\* \* \*

We got it right in *Figueroa*: "Under the plain language of the statute, a 'distribution' encompasses the transfer of a controlled substance from one person or place to another . . . ." *Figueroa*, 729 F.3d at 274. Here, the jury found that Semler actually transferred heroin to Werstler, and we should respect its finding. There is no statutory exception for putative joint purchasers or distribution among "friends," so we may not invent one. *United States v. Johnson*, 529 U.S. 53, 58 (2000) ("When Congress provides exceptions in a statute, it does not follow that courts have authority to create others. The proper inference . . . is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth."); *see also* Scalia & Garner, *supra*, at 93 (Omitted-Case Canon). And we should not be the first and only court to apply *Swiderski* to overturn a § 841(a) conviction.

24

I also dissent from the majority's remand on the sufficiency of the evidence supporting Semler's conviction. Reviewing the record "in the light most favorable to the prosecution," a rational factfinder could have found proof of guilt beyond a reasonable doubt. *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (en banc). I agree with the majority that the District Court did not err in its causation instruction. I would thus affirm the District Court's judgment of conviction.